**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| RANDSTAD GENERAL PARTNER (US), LLC,<br><br>Plaintiff,<br><br>v.<br><br>JOHN WILLIAMS and BEACON HILL STAFFING GROUP, LLC,<br><br>Defendants. | ) | CASE NO. 17-cv-<br><br>JURY TRIAL DEMANDED |

**VERIFIED COMPLAINT**

Plaintiff Randstad General Partner (US), LLC ("Randstad" or the "Company") files the following Verified Complaint for injunctive relief and damages against defendants John Williams ("Williams") and Beacon Hill Staffing Group, LLC ("BHSG") (collectively, "Defendants"). Randstad brings claims against Williams, a former Randstad employee, for breach of his non-compete, non-solicitation, and confidentiality obligations to Randstad, and for violations of the Defend Trade Secrets Act ("DTSA"). Randstad seeks injunctive relief against Williams for these violations. Randstad also brings claims against BHSG for tortious interference with Randstad's advantageous relationships with Williams, for common law unfair competition, and for violations of the DTSA.

**INTRODUCTION**

1. This is a classic case of unfair competition at its worst. Rather than spending the time and capital to build a new mid-market Managed Service Program ("MSP") group, a high end offering that large staffing organizations such as Randstad offer customers, BHSG decided to steal Randstad's. It lured away Randstad's most senior managers in its Randstad Corporate

Services ("RCS") division, a mid-market MSP provider, on information and belief offering them far greater than market salaries in exchange for Randstad's confidential information and trade secrets. Indeed, evidencing just how surreptitious BHSG was being, it told at least one of these employees not to inform Randstad that they were joining BHSG for at least 30 days, ostensibly so that BHSG could get the new division up and running before Randstad could obtain legal relief and/or shore up its client relationships.

2. Williams did not tell Randstad his plans, nor did he update his LinkedIn page to indicate where he had gone until several weeks later, and even then Williams did not indicate that he would be forming a mid-market MSP group for BHSG, which did not previously have one. Indeed, it was not until the very end of February 2017 that it finally was revealed—albeit not by Williams—that Williams was forming this new competitive MSP group at BHSG.

3. The website for this new group lists Williams and Kathleen Keliher ("Keliher"), another former Randstad employee located in Massachusetts, as its sole employees, touts their experience at Randstad (even disclosing confidential sales information), and effectively parrots Randstad's own marketing materials, using buzzwords and phrases that only Randstad had previously employed.

4. If that were not enough, shortly after going public with its new MSP group, BHSG, on information and belief, hired yet another employee of Randstad, Cristina Ethridge ("Ethridge"), who had broad access to some of Randstad's most sensitive information, including every RCS response to requests for proposals and slide decks used for client pitches. This is no coincidence, as Ethridge had worked closely with Keliher and Williams. Indeed, she was not in a public-facing role, and thus the only logical conclusion is that Williams (and Keliher) solicited her, either directly or indirectly, in violation of his agreement with Randstad.

5. It is also reasonable to conclude that Williams will inevitably, intentionally or otherwise, use and/or disclose Randstad's confidential information and trade secrets on behalf of BHSG in order to get its new MSP group off the ground far sooner, and for far less money, than it would have been able to do had it grown the business organically.

6. This is classic unfair competition by BHSG, and it must be stopped.

**PARTIES, JURISDICTION, AND VENUE**

7. Plaintiff Randstad is a Delaware limited liability company with a principal place of business in Atlanta, Georgia.

8. Williams is a former Randstad Senior Regional Vice President, whose residence is, upon information and belief, located at 9400 Todd Avenue, Fort Howard, Maryland.

9. Upon information and belief, BHSG is a limited liability corporation with headquarters located at 152 Bowdoin Street, Boston, Massachusetts, and with a regular place of business in Gaithersburg, Maryland.

10. This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 because Randstad's claim against Williams under the DTSA, 18 U.S.C. § 1836, *et seq.*, raises a federal question. Randstad's remaining claims likewise fall within this Court's supplemental jurisdiction (28 U.S.C. § 1367) because they are so related to the federal claim that they form part of the same case or controversy. Alternatively, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000.00.

11. This Court has personal jurisdiction over Williams because he made and performed contracts in Maryland, resides in Maryland, and he has breached duties and/or committed tortious acts in Maryland.

12. Williams also agreed to waive any objection to personal jurisdiction or venue in the underlying contract, which was an employment contract negotiated and executed in Maryland for work for services to be performed in Maryland, which provides that he:

> hereby (a) submits to personal jurisdiction in the State of Employment for any action arising out of or in connection with this Agreement; (b) waives any and all personal rights under the laws of any state to object to jurisdiction within the State of Employment; and (c) agrees that for any cause of action arising out of or in connection with this Agreement, venue is solely proper in any state or federal court within the State of Employment.

13. This Court has personal jurisdiction over BHSG because it has a regular place of business in Maryland has committed tortious acts in Maryland by interfering with a contract made and performed in Maryland.

14. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this dispute occurred within this District.

## FACTUAL BACKGROUND

### I. Randstad's Confidential Information and Trade Secrets

15. Randstad is a leader in the staffing solutions industry. It provides individual employees ("Talent") to a diverse portfolio of businesses and organizations ("Customers") nationwide on a temporary or permanent basis to meet the Customers' needs. Randstad specializes in the placement of professional Talent, providing a comprehensive array of placement services within a variety of industries, including accounting and finance, office and administration, engineering, healthcare, legal, information technology, banking, sales and marketing, among others.

16. The staffing industry is a highly competitive, specialized business that is relationship-driven between customers, Talent, and the sales force. Through decades of hard

work, dedication, innovation and investment, Randstad has become an industry leader in the staffing industry.

17. One of Randstad's operating companies is Randstad Sourceright ("Sourceright"), the "solutions" arm for Randstad. One of Sourceright's offerings is a traditional MSP, which provides support to large companies with substantial staffing needs that extends well beyond traditional contingent workforce supplier management, to cover full spectrum talent needs, including employee recruiting support, contractor retention programs, supplier engagement strategies and payrolling services.

18. An MSP in the staffing industry refers to an outsourced agency that manages the contingent worker (temporary staffing) program of a client company. They ensure the smooth day-to-day operations of pulling requirements from clients, the preferred vendors submitting candidates, onboarding of selected candidates and the ongoing management of temporary workers at the client company for the duration of the contract. Typically, MSPs—including Sourceright's—are found at large Fortune 1000 companies who might have thousands of contractors and hundreds of staffing agencies to manage.

19. In addition to Sourceright's traditional MSP offering for large companies, Randstad Corporate Services ("RCS"), another operating company of Randstad, offers another, distinct MSP, for mid-market companies with similar needs, but on a much different scale.

20. RCS is unique from other MSPs (including the Sourceright MSP) in that it serves mid-market companies with annual revenues between $5 and $30 million, and provides more direct staffing solutions (as opposed to managing other staffing firms). Essentially, RCS creates a "mini-branch" at each client to handle the client's staffing needs.

21. In other words, RCS is Randstad's unique "hybrid MSP" model, and provides a high touch, people first program that sits on-site with clients to provide a white glove level of service, while managing suppliers and containing costs. This is unique for mid-market companies.

22. Until mid-2016, RCS had *no* competitors in the mid-market MSP field, and even then, only one other company (arguably) competed with RCS for mid-market companies in the MSP space. This is not for lack of trying, but there are high barriers to entry in the mid-market MSP field, in part because the vendor management system or "VMS" technology used in traditional MSPs was created for much larger companies, due to its cost. RCS pioneered the mid-market MSP by building a specific team to implement VMS technology at a lower cost appropriate for mid-market companies. To this day, Randstad is one of only a small handful of companies that offer a mid-market MSP.

23. Randstad invests heavily in developing and maintaining Customer relationships and in attracting and retaining top Talent for both its internal operations and for assignments with its Customers.

24. Randstad's success in the highly competitive staffing industry is directly dependent on its staffing teams' Customer and institutional knowledge and Randstad's ability to provide top quality Talent to its Customers, and top quality job placements to its Talent.

25. To meet its Customers' expectations and needs, Randstad has developed and maintained, at great expense, valuable and long-standing working relationships and substantial goodwill with its Customers.

26. Randstad has reasonably come to expect that its long-standing Customer relationships will continue into the future.

27. To maintain Randstad's long-standing Client relationships and to develop new relationships, Randstad expends substantial time, effort, and expense developing confidential business information and trade secrets.

28. Randstad's trade secrets and confidential information are not generally known in the industry or outside of Randstad, and could be learned by others, if at all, only through the expenditure of considerable time, effort, and expense.

29. Randstad's trade secrets and confidential information are extremely valuable to Randstad because Randstad derives economic value from the information not being made public, and any Randstad competitor who acquired such information would be given an unfair competitive advantage.

30. Randstad's policies and procedures require that its trade secrets and confidential information be kept strictly confidential by its staff employees, and Randstad restricts access to such information.

31. Among other precautions, Randstad requires its employees to enter confidential, personal usernames and passwords in order to gain access to Randstad's server and e-mail accounts. Randstad further requires staff employees to enter a second, unique username and password in order to gain access to the confidential, secure CRM database. Other confidential databases, including a tool to assist with negotiating customer contracts, are also password protected.

32. Additionally, Randstad protects its confidential information by limiting access to physical space at its various offices. For example, employees must use company-issued badges to enter their office space. Randstad employees working out of home offices, such as Williams and Keliher, are required to have a receptionist or fellow colleague grant them access to office

space.

33. Randstad also requires many of its employees to execute employment agreements containing restrictive covenants to protect its confidential information.

34. Additionally, Randstad employees, including Williams, are bound by the Randstad Internal Employee Handbook (the "Employee Handbook," attached hereto as Exhibit A), which provides in part at Section 4.4 ("Code of Business Conduct"):

> Confidential, proprietary and trade secret information and trade or service marks are the exclusive property of Randstad and may not be used and/or disclosed outside the company without express written consent. The responsibility to protect Randstad's confidential information includes the responsibility of ensuring the security of your computer and your access to Randstad's systems. You should not give anyone your sign-in and passwords to any Randstad system without the express approval of your management. Additionally, you should close out all Randstad systems if you are leaving your workstation for any length of time and take any other reasonable actions to ensure the security of Randstad's systems. If you use a laptop computer, you must ensure the security of that computer and take all precautions necessary to prevent its theft.

35. Section 7.1 of the Employee Handbook ("Confidential & Proprietary Information") provides in part:

> Confidential, proprietary and trade secret information and trade or service marks of the Company are the exclusive property of Randstad and may not be used and/or disclosed outside the company without express written consent from the legal department. Confidential information includes any and all information relating to development, research, marketing activities, strategic plans and business and financial performance of any unit of the Company. It also includes the identity and individual needs of Randstad's client companies and prospective client companies, vendors, and prospective vendors; and the people and organizations with which you have relationships through the Company and the nature of those relationships.
>
> Confidential information also includes all information that Randstad may receive or has received from others with the understanding that it will not be disclosed. Trade secret information includes all information considered by applicable law to be trade secrets and treated as such by Randstad. Confidential, proprietary and trade secret information is to be kept strictly confidential.
>
> Randstad procedures, operations, research findings, sales results, financial performance, strategies and similar non-public information should not be

> discussed with anyone outside of the company – including media or representatives of another company – without the permission of the managing director or his/her designee for that particular area of the business. All confidential and proprietary information of the Company is the property of Randstad even after the employment relationship ends, regardless of the reason. You have a continuing obligation to respect the confidentiality of information that pertains to the business of Randstad that you may have obtained during your employment. If any of the foregoing types of non-public information is requested by anyone outside of Randstad, the appropriate managing director and/or the Legal Department should be notified. Until you obtain proper guidance, do not disclose the information.

36. Section 10.1 of the Employee Handbook provides in part:

> When employment with Randstad ends, regardless of the reason, all equipment, keys, access cards, etc. belonging to Randstad, including any equipment you have at home or elsewhere must be returned. Any confidential, proprietary and/or trade secrets information received from Randstad must also be returned. Employees will be required to complete a "Receipt for Return of Company Property" form returning all Randstad property prior to exiting the Company.

37. Additionally, Randstad employees are bound by an Electronic Communications Policy (attached hereto as Exhibit B) that provides, in part, that "[n]either voice mail nor e-mail should be used to send (upload) or receive (download) copyrighted materials, trade secrets, proprietary, financial information or similar materials without prior authorization. [. . .] Since no computer or communication system is completely secure, but may be accessed by those outside the Company, Randstad's voice mail and e-mail systems are not intended to transmit sensitive or confidential material such as pricing information or trade secrets. Caution and judgment should be exercised when considering sending confidential, proprietary or potentially harmful information either inside or outside the organization."

38. With respect to protection of passwords, the Electronic Communications Policy also provides that "[i]t is the user's responsibility to protect username and password information. This includes not allowing another person access to your privileges by giving them your sign-on information or allowing them to use your access by any means. This applies to all computer

systems that require authorization to access (e.g., Windows, network, e-mail, PRISM, etc.) The user is deemed solely responsible for any changes or access made under that user's username and password."

39. Randstad's employees, including Williams, receive substantial training, information, business contacts and other advantages that provide Randstad with a competitive advantage in the marketplace.

40. Williams, through his employment with Randstad, gained unique knowledge of and had access to Randstad's trade secrets and other confidential and proprietary information, including, without limitation, information relating to Randstad's business strategies, finances, methodologies, processes, pricing, Customers and employees ("Confidential Information").

## II. **Williams' Employment with Randstad, Employment Agreement, and Access to Confidential Information**

41. Williams was hired by Randstad on or around January 30, 2012, as an Area Vice President for RCS.

42. While employed by Randstad, Williams worked out of a home office in Fort Howard, Maryland.

43. As a condition of his employment with Randstad, Williams received and signed a Randstad Safety Net Agreement on or about January 30, 2012 (the "Agreement," attached hereto as Exhibit C).

44. The Agreement defines "Confidential Information" as:

> [A]ny and all data and information, whether disclosed orally, in writing, by observation, or otherwise, relating to Randstad's business: (1) of which [Williams] becomes aware as a consequence of, during, or through [his] employment with Randstad; (2) that is not generally known to its competitors or the public; (3) that is subject to reasonable efforts to maintain its secrecy; and (4) that is of commercial value to Randstad. Confidential Information covered by this Agreement does not have to be marked "Confidential" to be treated as such. Confidential Information may include, without limitation, information relating to

> Randstad's: formulas; patterns; designs; compilations; programs; methods; techniques; drawings; processes; research and development; legal affairs; accounting; finances; actual or potential customer information and lists; talent and prospect lists and information; customer and employment candidate contact names and information; customer preferences; the needs and hiring habits of Randstad's customers; billing rates; pricing practices; marketing, recruiting, and placement strategies; business plans; margins; prices; operations; existing and future services; and other financial, sales, marketing, services, and operations information, whether written or otherwise, which is not common knowledge in Randstad's industry or to the public. Confidential Information shall not include any data or information that has been voluntarily disclosed to the public or its competitors by Randstad (except where such public disclosure has been made by [Williams] without authorization) or that has been independently developed and disclosed by others, or that otherwise enters the public domain through lawful means.

45. The Agreement's "RECITALS" section states that:

> [Williams] acknowledges Randstad is in the highly competitive business of providing employment services for a wide range of short-term, long-term and direct hire positions in office, industrial, creative, technical, professional and other skill practices, to companies across the United States.
>
> [Williams] acknowledges that, in the course of its business, Randstad has developed and will continue to develop the considerable goodwill of its customers, employees, and talent. [Williams] acknowledges that [he] has participated in and benefited from that development and expects to continue to participate in and benefit from that development during his/her employment with Randstad. [Willaims] has or will also benefit from Randstad's training.
>
> [Williams] acknowledges, during his/her employment with Randstad, [he] is in a position where s/he has or may have access to Confidential Information of Randstad that is of great value to Randstad and could be used to compete unfairly with Randstad. Randstad has expended substantial time, money, and effort to develop and maintain this Confidential Information. Randstad's continuing ability to successfully engage in its business depends, in part, on this Confidential Information and its protection from unfair competition.

46. The Agreement further states that "[i]n consideration of [his] employment and/or continued employment, and the additional consideration of Randstad's promise to provide [Williams] with Confidential Information and training, to which [Williams] is otherwise not legally entitled, [Williams] agrees" to be bound by a number of obligations to Randstad.

47. For example, Section 2 of the Agreement, entitled "Limited Non-Compete," provides in part:

> (a) [Williams] agrees that, during the Prohibited Term [defined in the Agreement as "the actual term of [Williams'] employment with Randstad and for the 24-month period immediately following termination of [his] employment with Randstad, for whatever reason, whether that termination is effected by [Williams] or Randstad"] and within the Work Territory [defined in the Agreement as "each county in which [Williams] worked or provided services on behalf of Randstad in the last year of [his] employment with Randstad"], [Williams] will not compete, directly or indirectly, with the Business of Randstad [defined in the Agreement as "the business of providing employment services for short-term, long-term and direct hire positions in office, industrial, creative, technical or professional skill practices"] by performing the same or substantially similar activities [he] performed for Randstad during the one year prior to [his] termination of employment, regardless of whether [Williams] performs such activities on behalf of himself/herself, or any other person or business that competes with the Business of Randstad.

48. Section 3 of the Agreement, entitled "Non-Solicitation of Customers," provides:

> (a) [Williams] agrees that, during the Prohibited Term, [he] will not directly or indirectly solicit, do business with, or attempt to solicit or do business with any of Randstad's customers or prospective customers with whom [Williams] had Material Contact [defined in the Agreement as "(1) interaction with the customer in an effort to further a business relationship with Randstad; (2) supervising Randstad's relationship with the customer; (3) supervising Employees who interacted with the customer in an effort to further a business relationship with Randstad; or (4) learning Confidential Information about the customer in the course of [Williams'] employment with Randstad"] during the last twenty-four (24) months of [Williams'] employment with Randstad. This restriction is limited to soliciting or doing business in competition with the Business of Randstad.
>
> (b) [Williams] agrees that, during the Prohibited Term, [he] will not directly or indirectly solicit, or attempt to solicit any of Randstad's customers or prospective customers with whom [Williams] had Material Contact during the last twenty-four (24) months of [his] employment with Randstad. This restriction is limited to solicitation of business in competition with the Business of Randstad.

49. Likewise, pursuant to Section 4 of the Agreement, entitled "Non-Solicitation of Employees," Williams agreed that for the Prohibited Term:

> [Williams] agrees that, during the Prohibited Term, [he] will not directly or indirectly solicit or attempt to solicit any employee of Randstad with whom [he] had business contact during the last twenty-four (24) months of [his] employment,

> for the purpose of encouraging, enticing, or causing said employment to terminate employment with Randstad, or to accept employment with any person or business that competes with the Business of Randstad.

50. Section 5 of the Agreement, entitled "Non-Solicitation of Talent," provides that for the Prohibited Term:

> [Williams] agrees that, during the Prohibited Term, [he] will not directly or indirectly solicit or attempt to solicit any employment candidate (a/k/a "Talent") of Randstad with whom [he] had business contact during the last twenty-four (24) months of [his] employment, for the purpose of encouraging, enticing, or causing said Talent to terminate employment with Randstad, or to accept work assignments from any person or business that competes with the Business of Randstad.

51. Section 6 of the Agreement, entitled "Non-Disclosure of Confidential Information and Trade Secrets," states that:

> [Williams] agrees that all Confidential Information and all physical embodiments thereof are confidential to Randstad, and will remain Randstad's sole and exclusive property. [Williams] warrants and agrees that, during and after his/her employment with Randstad, [Williams] will not reproduce, use, distribute, disclose, publish, misappropriate or otherwise disseminate any Confidential Information except on behalf of Randstad, and will not take any action causing, or fail to take any action to prevent, any Confidential Information to lose its character as Confidential Information during the Prohibited Term. As to any Confidential Information that constitutes a Trade Secret [defined in the Agreement as "Confidential Information which meets the additional requirements of the Uniform Trade Secrets Act or similar state common or statutory law"] under applicable law, these restrictions shall apply for so long as the information in question remains a Trade Secret.

52. Section 8 of the Agreement, entitled "Return of Property," provides that:

> All Confidential Information, Trade Secrets, and other Randstad records, files, memoranda, reports, lists, materials, drawings, designs, proposals, plans, sketches, documents, computer programs, disks, computer printouts and the like (together with all copies thereof) relating to the business of Randstad, which [Williams] used, prepared, or came in contact with in the course of, or as a result of, [his] employment with Randstad are the sole property of Randstad. [Williams] shall return all such materials, including copies, and any desktops, laptops, cell phones, Blackberries, or other personal hand-held devices which Randstad provided to [Williams] for use while at Randstad, to Randstad upon request by Randstad or immediately upon the end of his/her employment with Randstad. [Williams] also agrees to delete any Confidential Information or Trade Secrets

> (especially customer or Talent contact information) found on [his] personal cell phone, Blackberry, PDA, personal data device, home computer, or e-mail account(s) within five (5) days of the end of his/her employment with Randstad.

53. Section 9 of the Agreement, entitled “Remedies for Breach of Contract,” states that:

> [Williams] acknowledges that the covenants specified in Paragraphs 2-8 contain reasonable limitations as to time and scope of activities to be restricted and that such promises do not impose a greater restraint on [Williams] than is necessary to protect the goodwill, Confidential Information, Trade Secrets, customer, employee, and candidate relations, and other legitimate business interests of Randstad. [Williams] also acknowledges and agrees that any violation of the restrictive covenants set forth in Paragraphs 2-8 would bestow an unfair competitive advantage upon any person or entity, which might benefit from such violation, and would necessarily result in substantial and irreparable damage and loss to Randstad. Accordingly, in the event of a breach or a threatened breach by [Williams] of Paragraphs 2-8 of this Agreement, Randstad shall be entitled to an injunction restraining [him] from such breach or threatened breach, as well as recovery of its costs and reasonable attorneys' fees. Nothing herein shall be construed as prohibiting Randstad from pursuing any other remedies available to it for such breach or threatened breach including the recovery of damages from [Williams]. In the event that Randstad should seek an injunction hereunder, [Williams] waives any requirements that Randstad post a bond or any other security.

54. Section 10 of the Agreement, entitled “Effect of Violations by Employee,” provides:

> [Williams] agrees and understands that any action by him/her in violation of this Agreement shall require [Williams] to pay all reasonable costs and attorneys' fees expended by Randstad in bringing an action to enforce this Agreement or in defending any action [Williams] brings, plus any other damages to which Randstad may be entitled.

55. Section 16 of the Agreement, entitled “Governing Law/Selection of Forum,” states:

> This Agreement shall be governed by, and construed in accordance with, the laws of the State in which [Williams] is employed by and performs services for Randstad as of the date [he] executes this Agreement ("State of Employment"). [Williams] hereby (a) submits to personal jurisdiction in the State of Employment for any action arising out of or in connection with this Agreement; (b) waives any and all personal rights under the laws of any state to object to jurisdiction within

> the State of Employment; and (c) agrees that for any cause of action arising out of or in connection with this Agreement, venue is solely proper in any state or federal court within the State of Employment.

56. Finally, immediately preceding the signature block, the Agreement provides in bold:

> **[Williams] warrants that s/he has read and fully understands the contents and the effect of this Agreement. [Williams] warrants and agrees that s/he has had a reasonable opportunity to review and consider the content and effect. [Williams] accepts each and all of the terms, provisions, and conditions of this Agreement, and does so voluntarily without duress or pressure from Randstad and with full knowledge and understanding of the contents, nature, and effect of this Agreement.**

57. Never once did Williams ever tell Randstad that he did not understand anything in the Agreement or that he did not intend to comply therewith. Had he done so, Williams would not have been provided with access to Randstad's confidential information and trade secrets, or to its Customers and Talent. Indeed, he likely would have been terminated. Randstad reasonably believed that Williams did, in fact, understand and intend to comply with the Agreement in its entirety, and reasonably relied thereon in continuing to employ him and to provide him with access to its confidential information and trade secrets, and access to its Customers and Talent.

58. As noted *supra*, Williams was also bound by the provisions of the Employee Handbook, including the provisions contained therein regarding protection of confidential information. In fact, Williams signed an acknowledgement on January 24, 2012 representing that he had received information regarding the Employee Handbook, was aware that it was accessible on the Randstad intranet website, and that on request, he could receive a hard copy from Human Resources. He also acknowledged that he had read the Employee Handbook and was familiar with its terms and conditions.

59. As an Area Vice President, Williams was responsible for managing RCS's mid-Atlantic region (covering New York, New Jersey, Pennsylvania, Delaware, Maryland, Washington D.C., Virginia, North Carolina, and South Carolina), including driving profitable growth, managing a P&L, and maintaining relationships with C-level contacts within the client's organization while ensuring consistent RCS product delivery and compliance. In this role, Williams was a field leader, and was also responsible for hiring his team, overseeing the team's operations, and expanding the team's customer base.

60. On or about February 11, 2013, Williams was promoted to Regional Vice President of RCS. In addition to his prior responsibilities, Williams helped design RSC's MSP strategy.

61. In or around November of 2015, Williams was promoted again to Senior Regional Vice President of RCS, which expanded his territory to include Texas and Georgia, in addition to the mid-Atlantic region. In that role, Williams directly oversaw approximately 8 employees, and indirectly oversaw approximately 30 employees.

62. Williams worked closely with Keliher; in fact, Keliher, who was in more of a sales role, would often bring Williams in as a "field expert" to collaborate on prospects.

63. After his promotion, Williams sat on the five member executive committee (which later expanded to eight members) with Keliher and RCS President Shirley Jones ("Jones"), among other people, and he was one of the most senior level employees in RCS, and was provided with access to some of Randstad's most sensitive information. This executive committee set RCS's overall strategy, identified RCS's approach to the market, discussed its operations, sales, financials, client retention strategy, and competitive trends, and defined its

solutions. Some of RCS's most sensitive information was discussed at executive committee meetings.

64. While employed by Randstad, and particularly in his role as Senior Regional Vice President and executive committee member, Williams was given access to Randstad's trade secrets and confidential information, including but not limited to details regarding RCS's operations, structure, strategy, financial information, and future plans.

65. The confidential information to which Williams had access during his employment with Randstad constitutes trade secrets that are critical to Randstad's competitive position in the staffing industry.

66. If Randstad's trade secret information were to fall into the hands of a competitor, such as BHSG, Randstad's competitive position would be severely harmed, and the competitor would be able to trade on many years' worth of valuable accumulated knowledge. Likewise, if a former employee, such as Williams, retained Randstad's confidential trade secrets after his employment ended, and he accessed them while working for a competitor, Randstad's competitive position would be seriously harmed.

## III. Cristina Ethridge's Employment with Randstad, Employment Agreement, and Access to Confidential Information

67. Ethridge was hired by Randstad Professionals US, LP ("Randstad Professionals") in or around June 2011 as a Business Development Specialist in the Customer Intelligence division, which provides full lifecycle sales support to build and expand client relationships across the organization. In that role, Ethridge was responsible for receiving and responding to requests for proposals (RFPs), creating presentations to accompany proposals, collecting and coordinating any legal documentation, acting as a liaison for corporate information, conducting

market and industry research and providing guidance on industry trends, and serving as an advisor to the field.

68. In or around January of 2014, Ethridge was promoted to Junior Business Development Team Lead, On-Site and Master Vendor Solutions. In addition to her other responsibilities as a Business Development Specialist, in this role, Ethridge led the on-site and MSP vertical of her team, working as a business partner to field sales and management leaders to ensure the materials the team created were competitive, uniquely customized, and representative of the client-specific solutions crafted for each customer. Ethridge was also required to mentor and monitor junior personnel, review and edit proposal content, conduct performance evaluations, and assist in the development of best practices surrounding the team's core competencies.

69. In or around April 2016, Ethridge was again promoted, this time to Business Development Team Lead. In that role, in addition to her other responsibilities, she led the MSP and healthcare solutions vertical of the team.

70. In her role, Ethridge had access to some of Randstad's most sensitive information, including a listing of each RCS account and prospect, and location and financial information associated with those accounts; revenue by week; Randstad's presentation decks, and all of the data that was utilized in each of Randstad's responses to RFPs from customers and prospective customers (which included such information as RCS's largest customers, its prospects, pricing information and strategy, etc.). In fact, Ethridge was responsible for *all* of RCS's RFP responses, and was thus had a unique view into RCS that few, if any, other employees had. For example, prior to her resignation, Ethridge was working on an RFP for a customer project worth *billions* of dollars.

71. Simply put, Ethridge had access to a volume of confidential and proprietary information that virtually no one else at Randstad would have.

72. As a condition of her employment with Randstad, Ethridge received and signed a letter agreement on or about May 23, 2011 (the "Ethridge Agreement," attached hereto as Exhibit D).

73. The Ethridge Agreement provides, among other things:

> Randstad Professionals US is recognized throughout the United States and abroad for its expertise in providing personnel services to various industries and offices. Randstad Professionals US has spent substantial amounts of time, money, and effort in developing and perfecting its techniques, processes, business methods, management and financial expertise, customer and business accounts, personnel resources and other data, all of which is highly confidential information not known to the general public (the "confidential information"). All of these items are valuable, special and unique to Randstad Professionals US. As an employee of Randstad Professionals US, you will be entrusted with this confidential information in the performance of your duties.
>
> During and after the term of your employment with Randstad Professionals US, you will not divulge to any others or use for your own benefit any confidential information. This confidential information includes, but is not limited to, any information relating to sales, sales volume, customer mark-up, business strategy, customers and clients of Randstad Professionals US, the names of permanent placements, temporary assignments, processes, methods, ideas or improvements that belong to or relate to the business of Randstad Professionals US. You recognize and acknowledge that any list, (written or unwritten) of Randstad Professionals US customers, clients and employees, the prices charged by Randstad Professionals US to its clients for its services, and salaries paid by Randstad Professionals US are also confidential information and a valuable, special, and unique asset of the Company's business. You will not, during or after the terms of your employment with Randstad Professionals US, disclose confidential information without Randstad Professionals US written permission or consent to any person, firm, corporation, association, or other entity for any reason or purpose, nor will you use such information for your own benefit.

74. The Ethridge Agreement also provides that upon termination of her employment with Randstad, Ethridge will "return to an officer or representative of the company all records, papers, documents, data and all other property in [her] possession which belongs to Randstad

Professionals US and which contain any confidential information," and prohibits her from removing "any papers, documents, data or records of any kind, or any copies or reproductions."

75. The Ethridge Agreement further provides if she fails to abide by her responsibilities set forth therein, "Randstad Professionals US will be entitled to immediate temporary and permanent injunctive relief preventing any further violation of [her] responsibilities, as well as any money damages which it incurs as a result of [her] actions. [Ethridge] will also forfeit all unpaid compensation in any form through the date of the breach."

76. On information and belief, Williams was aware of Ethridge's contractual obligations.

77. Ethridge was also bound by the Randstad Associate Handbook (the "Associate Handbook," attached hereto as Exhibit E), and acknowledged her receipt thereof.

78. Section 11.1 of the Associate Handbook provides in part:

> Associates are expected to demonstrate an appropriate level of care/security for all Property [defined in the Handbook as "[a]ll property, equipment, and materials supplied to you by Randstad or its client"] used. This also includes any property or materials the client may entrust you with in the performance of your work assignment. Under no circumstances should Property be left in personal automobiles (even if locked) or any unsecured location. If any Property is damaged, lost or stolen, Associates must report it to their manager.

79. Section 11.2 of the Associate Handbook provides in part:

> Associates may not misuse or make unauthorized disclosures of non-public, confidential information (including trade secrets) that is acquired during the course of employment with Randstad. The confidential information of Randstad and its clients should be held in trust and confidence, not disclosed to any third party, and only used for the advancement of Randstad and/or client's interests, either during employment or following termination of employment for any reason. Examples of confidential information include, but are not limited to, non-public, proprietary details about Randstad and/or its client's strategies, operational plans, pricing, financial information and forecasts, personnel information, payroll information, personally identifiable information, protected health information and trade secrets. No copies, abstracts or summaries or such materials may be made except for use in performing duties for Randstad or its client. Any such materials must be returned to Randstad prior to leaving Randstad.

80. Section 11.6 of the Handbook provides in part:

> Upon request by Randstad or its client, at any time, and in any event upon termination of the Associate's employment with Randstad for any reason, Associates shall promptly deliver to Randstad all Property . . . within their possession or control. If any Property belonging to the Customer or Randstad is not returned, you will be subject to any and all remedies available under applicable law for the recovery of such Property.

81. On information and belief, Williams was aware of Ethridge's obligations under the Associate Handbook.

82. Ethridge, while not formally a part of RCS, nevertheless worked very intimately with both Williams and Keliher. Accordingly, as discussed above, Ethridge had intimate knowledge of RCS's inner workings and strategies and the MSP offering as a whole, and she was responsible for every single RCS RFP response, prepared presentation decks for client pitches, and collected and maintained customer and market data for the MSP group, all of which were highly confidential. She effectively knows everything there is to know about the RCS division and its MSP offering, and could harm Randstad substantially if she were to use or disclose such information to or on behalf of a competitor, even if inadvertently.

## IV. <u>Williams and Keliher Resign from Randstad</u>

83. On November 4, 2016, Williams spoke with Alp Perahya ("Perahya"), his immediate supervisor at Randstad, and resigned; however, it was initially unclear whether Williams had actually resigned because he was so evasive and unclear.

84. Shortly thereafter, Shirley Jones ("Jones"), President of RCS, attempted to speak with Williams to confirm whether he was resigning. Williams emailed Jones and Perahya on November 8, 2016 stating that his resignation was "an irreversible decision."

85. Perahya emailed Williams on November 8, 2016 to ask about Williams' exit plan, last day, and communication plan. Williams never responded.

86. Likewise, despite Jones' numerous attempts to contact Williams to discuss his resignation, and despite Williams' promises to find time to communicate with Jones, Williams never connected with her.

87. Williams failed to provide any notice of his resignation.

88. On the same date, November 4, 2016, in what was ostensibly a coordinated effort with Williams, Keliher likewise called her immediate supervisor, Jane Ligrani ("Ligrani"), and resigned, although like Williams, her resignation was also very vague. Keliher informed Ligrani that she was "done," but that she was too emotional about it and could not discuss it further.

89. The following day, Ligrani asked Keliher to confirm that her last day with Randstad was the previous day, November 4. Keliher confirmed this. In other words, like Williams, Keliher failed to provide any notice of her resignation.

90. On November 5, 2016, Keliher exchanged several text messages with Jones, who was Keliher's former direct supervisor. Keliher told Jones that she was going to a smaller company, and that she would never join one of Randstad's bigger competitors. However, Keliher refused to say which company she was joining, and admitted that the CEO of her new employer had instructed her not to divulge its identity for 30 days. Similarly, Keliher did not say what she would be doing at this smaller company.

91. Keliher also told Cheryl MacMillan, Senior Vice President of RCS, that the CEO of her new employer instructed her not to share its identity for 30 days.

## V. <u>Williams and Keliher Join BHSG</u>

92. Several weeks after Keliher resigned, Jones noticed that Keliher had finally updated her LinkedIn profile to reflect that she had joined BHSG. However, at that time, Keliher's profile did not reflect which BHSG business line she was employed in, which Jones

found curious. BHSG did not at the time have an MSP group, nor was there any indication on its website or in press releases that it was intending to form one. As such, Jones reasonably believed that Keliher would be working in a different business line.

93. Similarly, Jones noticed that Williams' LinkedIn profile reflected that he, too, had joined BHSG, but just like Keliher, his profile also did not reflect which BHSG business line he was employed in. Again, Jones reasonably assumed that he, too, would be working in an existing BHSG business line.

94. Jones viewed Keliher's and Williams' LinkedIn profiles again very recently, at the end of February. Jones discovered that Keliher had updated her profile to reflect that she was the Managing Director and Executive Vice President of "BH Solutions." This was the first time Jones had ever heard of this group, and an internet search confirms that there were no prior public announcements of such.

95. As of the date of this filing, Williams' LinkedIn profile still does not reveal that he is working for BH Solutions.

96. BHSG's website makes it clear that its new solutions group is virtually a carbon copy of RCS. For example, the BHSG website states that "Beacon Hill Solutions provides **customized**, **high-touch**, **on-site** talent and **supplier management solutions** to clients across the country. With a completely **flexible** and **scalable** approach, our **integrated total-talent programs** address the unique needs of our clients, while delivering a **consultative partnership** that brings together a **single point of contact**, seamless supplier coordination, and true transparency and visibility with an evolved **VMS technology**."[1] (all bolding added to highlight similarities to Randstad's own proprietary marketing materials).

[1] https://www.beaconhillstaffing. com/BH-Specialties/BH-Solutions/Solutions-Home

97. BHSG's website also states: "To remain competitive in today's market for talent, companies must maintain **agility** while maximizing their workforce across an entire enterprise. When **separate delivery silos** become inefficient, our **Integrated Talent Solutions** model allows for a modular, **flexible**, and **customized** approach to address client talent supply chain needs across an organization including contingent workers, full-time workforce, independent contractors and consultants, SOW, freelancers and payrolled workers."[2]

98. Yet another area of BHSG's solution site states: "Our **consultative** and **customized** approach allows us to design and architect a solution specific to each client's unique environment, providing all of the benefits of a managed program with a **high-touch, white glove** approach."[3].

99. The foregoing language is all eerily reminiscent of RCS's and Sourceright's own marketing materials:

- "Randstad Corporate Services (RCS) delivers comprehensive **onsite** strategic **supplier management** and human capital solutions. Our innovative model aligns **single point-of-contact service** delivery with robust **VMS technology** that may be customized to meet your total staffing needs. We are a highly **consultative staffing partner** with a commitment to exceptional customer service and program **flexibility**."[4]

- "Randstad Sourceright is on the forefront of delivering total talent solutions designed to drive business **agility**, **scalability**, and **flexibility**."[5]

- "A prescriptive approach to the 'right' talent will narrow the possibilities; **pre-defined silos** or classifications will only get in the way of progress and limit your competitiveness. Today's **integrated talent solutions** are not the simple blend of RPO and MSP, they are game-changers, specially designed to take on a total business view. In

---

[2] https://www.beaconhillstaffing.com/BH-Specialties/BH-Solutions/Solutions-Capabilities/ Offerings-Delivery-Models#ITS

[3] https://www.beaconhillstaffing.com/BH-Specialties/BH-Solutions/Solutions-Capabilities/Our-Commitment

[4] https://www.randstadusa.com/staffing-and-solutions/workforce-solutions/on-site-management/corporate-onsite-management/

[5] https://www.randstadsourceright.com/our-solutions/integrated-talent-solutions/)

the emerging field of **integrated talent solutions**, we have hands-on success bringing this total view to organizations across industries and around the world."[6]

- "[T]he **high-touch approach** brings the strategy to a new level, providing dedicated **on-site** resources to act as the complete fulfillment function for client talent needs. This includes all aspects of **flexible** talent, including contingent workers, SOW and freelance workers, as well as direct permanent hire recruitment. The result is a 'one-stop shop' that enables a **seamless** process and **single-point** resource for addressing all talent needs."[7]

- "RCS offers our partners **single-point-of contact** access to comprehensive staffing services through an **onsite, customized total talent solution** and **white glove service!**"[8]

- "The result is a consistent, **high-touch program** customized to business vision and goals, company culture, industry, and geographical footprint. The benefits of an include holistic management, consistent processes, access to best talent, cost efficiencies, governance enhancement, and access to best practices and innovation."[9]

- "Randstad Sourceright report highlights the impact of **total talent solutions** for mid-sized businesses"[10]

- "Moving forward, a **total talent strategy** will become a priority as more and more companies begin to integrate processes and better compete for scarce workers. If you find yourself managing workforce decisions in a mid-sized company, start the total talent conversation now. It's an investment that will pay off, both in near-term efficiency and long-term growth."[11]

- "**Total Talent** for MSP for Mid-Sized Companies."[12]

100. The similarity between Beacon Hill Solutions' website and Randstad's own website and other marketing materials is uncanny, and no doubt intentional.

101. BHSG's website now features a biography of Keliher on the Beacon Hill Solutions page, which states, in part:

---

[6] https://www.randstadsourceright.com/our-solutions/integrated-talent-solutions/

[7] http://insights.randstadsourceright.com/h/i/288117993-the-evolving-model-of-msp-and-total-talent-partnership

[8] https://www.randstadusa.com/jobs/search/rsr/onsite-recruiter-account-manager-mspvms_berlin_13130429/

[9] http://insights.randstadsourceright.com/h/i/147857563-assessing-the-benefit-of-an-integrated-talent-solution

[10] http://insights.randstadsourceright.com/h/i/331478766-randstad-sourceright-report-highlights-the-impact-of-total-talent-solutions-for-mid-sized-businesses

[11] http://insights.randstadsourceright.com/h/i/330890151-total-talent-msp-for-mid-sized-companies?utm_campaign=social+postings&utm_source=PR

[12] available at http://insights.randstadsourceright.com/h/i/330890151-total-talent-msp-for-mid-sized-companies

> Ms. Keliher is responsible for leading and directing Beacon Hill Solutions and its national expansion. With more than 15 years in the staffing industry, she is considered an expert in architecting and delivering complex industry leading solutions. She is known for her customized high touch approach by always putting her clients' needs first. She works with clients of various sizes and scopes to deliver a solution that is unique to their needs including MSP/VMS, Master Vendor, RPO, SOW, 1099 and Pay Rolling. She is creative in her approach and excels at solving complex client problems by bundling solutions together to bring a comprehensive total talent approach to her clients. Prior to joining Beacon Hill, Ms. Keliher was a VP of Sales and member of the Executive Committee for the solutions and services division of the 2nd largest workforce company in the world, where she was responsible for the development, growth, and management of the sales strategy, helping to build the business from concept to more than 50 clients nationally exceeding 400M spend under management.

102. Likewise, the BHSG website now features a bio of Williams on the Beacon Hill Solutions page, which states in part:

> Mr. Williams is responsible for leading and directing delivery, client service, and operations across the country for Beacon Hill Solutions. As one of Beacon Hill Solutions' founding executives, he also serves on its advisory committee. With almost two decades in the staffing industry, managing both branch and strategic engagements across all verticals, Mr. Williams is known for building high performing teams and collaborating with client partners to design customized solutions specific to their unique needs. His commitment to bringing best practices and partnership evolution to all engagements has earned him many accolades and awards throughout his career. Prior to joining Beacon Hill, Mr. Williams served as a senior regional vice president for one of the world's largest global staffing organizations. In this former role, he served on their executive committee while leading the largest region for its fastest-growing solutions division, creating blended delivery operations across multiple services for the mid-market to large Fortune 500 companies across the United States.

103. Keliher's and Williams' bios are the only two bios on the Beacon Hill Solutions Leadership page,[13] which, on information and belief, was only made public in mid-February of 2017. Upon information and belief, BHSG purposefully waited until months after Williams (and Keliher) had resigned to make this page public in an effort to lull Randstad into inaction.

[13] available at https://www.beaconhillstaffing.com/BH-Specialties/BH-Solutions/Leadership

This was likely why BHSG's CEO told Keliher not to tell Randstad where she would be working for 30 days.

104. Upon information and belief, Williams is working for BHSG out of its Washington, DC office, and is servicing clients in the same territories he served while employed by Randstad (i.e., the mid-Atlantic, Georgia, and Texas).

## VI. Ethridge Resigns And, On Information And Belief, Joins BHSG

105. On or about February 13, 2017, Ethridge submitted her resignation to Heather Gollnick ("Gollnick"), Randstad's Senior Manager of Business Development, and Peter Argeros ("Argeros"), Vice President, Randstad Customer Intelligence, and stated that her last day would be March 3, 2017. At that time, just as Keliher had stated when she resigned, Ethridge informed Gollnick and Argeros that the CEO of her new employer, which she acknowledged was a competitor, had instructed her not to disclose where she would be working for 30 days. Ethridge was nevertheless terminated and her access to Randstad's computer system and e-mail was cut off on February 22, 2017.

106. Upon information and belief, Ethridge intends to join, or has already joined, BHSG's nascent MSP group, along with Keliher and Williams.

107. Upon information and belief, Williams (and/or Keliher) solicited Ethridge, whether directly or indirectly, to join BHSG's MSP group, in direct violation of his non-solicitation obligation to Randstad. Indeed, Ethridge was not in a public-facing role at Randstad, and thus only someone who knew her work, ostensibly by working with her at Randstad, would have known of her and the value that she could provide to a burgeoning MSP group such as Beacon Hill Solutions. In other words, it would have been virtually impossible for BHSG to have stumbled across Ethridge unless Williams (and/or Keliher), at the very least,

told BHSG to recruit her, which would constitute indirect solicitation in violation of the Agreement. Indeed, Williams may have even solicited her directly.

108. On or about March 3, 2017, Randstad sent Ethridge a letter reminding her of her continuing obligations to Randstad, including but not limited to her obligation to return any property belonging to Randstad. In response, by letter dated March 7, 2017, Ethridge returned 103 pages of documents belonging to Randstad, including but not limited to a highly confidential, 76-page RFP response dated May 27, 2016, and which is labeled "Proprietary and confidential" at the bottom of each page.

## VII. Randstad's Forensic Review

109. Upon learning of Williams' plans to work for BHSG as part of its new MSP group, Randstad commenced a forensic review of his electronic activities prior to resigning.

110. Randstad's forensic review is ongoing; however, Randstad has already discovered that Williams improperly forwarded highly confidential information to his personal email address shortly before resigning.

111. On September 29, 2016 (just a few weeks before resigning from Randstad, and undoubtedly after he had already begun talking to, if not received an offer from, BHSG), Williams forwarded to his personal email account an email that he received on his Randstad email account from another Randstad employee attaching a confidential PowerPoint presentation entitled "Randstad Centralized Delivery." This presentation, which was personalized based on the RCS accounts Williams was responsible for, described the design and structure of Randstad's Centralized Delivery model (a lower cost way to make placements, which is only just now being rolled out internally within Randstad) and how it would support Williams' specific accounts and programs. This presentation is internal only, highly confidential and proprietary, and should not have been forwarded to Williams' personal email. Specifically, this presentation presents

various scenarios regarding Williams' accounts, including how the new centralized delivery model would be implemented in those accounts. This presentation contained highly confidential Randstad information that would be extremely valuable to a competitor, in particular a new market entrant such as BHSG.

112. Similarly, and no doubt in coordination with Williams, on September 26, 2016 (just a few weeks before resigning from Randstad, and undoubtedly after she, too, had already begun talking to, if not received an offer from, BHSG), Keliher forwarded to her personal email account an email that she (along with Williams and three other Randstad employees) had received on her Randstad email account from Ethridge, attaching a confidential, 147-page draft RFP response to a prospective customer, which had been prepared by Ethridge. This RFP response contained detailed information regarding, among other things, the new Centralized Delivery model, Randstad sales and pricing information, and highly confidential information relating to RCS's unique business model. The information contained in this RFP response was subject to a mutual non-disclosure agreement between Randstad and the prospective customer.

113. This information would be extremely valuable to a competitor, particularly to a new market entrant such as BHSG, which would otherwise have to spend a substantial amount of time and money accumulating the information contained in the RFP response, not to mention that it contained highly confidential Randstad information that could certainly be used to compete unfairly with Randstad.

114. On information and belief, Keliher and Williams received offers, formal or informal, from BHSG in mid- to late-September.

## VIII. BHSG's Hire of Williams, Keliher, and Ethridge Constitutes an Attempt to Unfairly Compete with Randstad and Build an MSP Group Using Randstad's Work

115. Prior to BHSG's hire of Keliher, Williams, and, on information and belief, Ethridge, BHSG did not have an MSP group. In fact, BHSG issued a press release on February 27, 2017, announcing Beacon Hill Solutions as its eighth division, to be run by Keliher and Williams.[14] On information and belief, other than the page on BHSG's website, this was the first public announcement of the formation of this new group.

116. Similarly, on March 3, 2017, Staffing Industry Analysts, a global advisor on staffing and workforce solutions, published a write-up on Defendants, which stated:

> Beacon Hill Staffing Group, headquartered in Boston, announced Managing Director Kathleen Keliher and Executive Director John Williams will lead its new division—Beacon Hill Solutions—which will provide customized programs across multiple specialties. Keliher is responsible leading the division and its national expansion; she previously was VP of sales and a member of the executive committee for the solutions and services division of a large workforce company. Williams is responsible for client service and operations nationwide; he previously was a senior regional VP for a large global staffing organization where he served on their executive committee.

117. On information and belief, BHSG hired Williams, Keliher, and (on information and belief) Ethridge to form an MSP group using Randstad's confidential information and trade secrets, in order to compete unfairly with Randstad and enter the market without the required investment of time or capital.

118. Indeed, with Williams', Keliher's, and Ethridge's intimate knowledge of RCS and its mid-market MSP offering, BHSG has a blueprint to create a competing division, without putting in the time, money, and effort that would otherwise be required to establish its MSP division.

119. Given BHSG's obvious push to enter the MSP space, as evidenced by its hiring

[14] http://www.prnewswire.com/news-releases/beacon-hill-launches-new-division--bh-solutions-300413936.html

of Williams, Keliher, and (on information and belief) Ethridge, and its website pages that parrot Randstad's own language, it is reasonable to conclude that Williams, Keliher, and Ethridge have utilized and/or inevitably will utilize Randstad's trade secrets and confidential information to build this new practice for BHSG and to compete unfairly with Randstad. Indeed, that is likely why they were hired.

120. BHSG's CEO's directive to Keliher and Ethridge not to disclose BHSG as their new employer evidence an attempt to conceal facts from Randstad and to lull Randstad into inaction. These actions evidence BHSG's improper motives in hiring Williams, Keliher, and on information and belief, Ethridge, and in inducing Williams to breach his obligations to Randstand. This is classic unfair competition.

**COUNT I: VIOLATIONS OF THE DEFEND TRADE SECRETS ACT OF 2016**
**(Against Both Defendants - For Damages and Injunctive Relief)**

121. Randstad repeats and realleges each and every allegation contained in Paragraphs 1 through 120 of the Complaint as if fully set forth herein.

122. The Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.*, which amended the Economic Espionage Act, 18 U.S.C. § 1832, to add a federal civil cause of action, among other things, defines "trade secret" to include all forms and types of financial, business or economic information, including patterns, plans, compilations, methods, techniques, processes, procedures or programs, if (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, the public.

123. Williams acquired Randstad's trade secrets by improper means and without authorization. For example, Williams forwarded highly confidential Randstad information and

materials to his personal email accounts, in violation of Randstad's policies regarding protection of confidential information, including but not limited to the policies contained in the Associate Handbook.

124. Upon information and belief, Williams has also used or disclosed Randstad's trade secrets to or on behalf of BHSG, in violation of his obligations under the Agreement and the Associate Handbook, and/or has threatened to misappropriate Randstad's trade secrets in violation of the DTSA.

125. Upon information and belief, BHSG willingly received those trade secrets knowing that they were improperly obtained by Williams in violation of his agreement with Randstad, and may have even directed Williams to improperly acquire those trade secrets.

126. The information that Williams has, upon information and belief, used on behalf of or provided to BHSG, or threatens to use on behalf of or provide to BHSG, regarding Randstad's RCS division constitutes a trade secret within the meaning of the DTSA. Such information derives independent economic value from not being generally known to, or readily ascertainable by proper means by, the public; other persons can obtain economic value from its disclosure or use; and it is the subject of significant efforts to maintain its secrecy.

127. As detailed above, Randstad takes reasonable and appropriate measures to protect the confidentiality of the above-described trade secrets.

128. The Defendants knew or should have known that Randstad's trade secrets (a) are confidential; (b) were acquired under circumstances giving rise to a duty to maintain their secrecy or limit their use; (c) were developed or acquired by Randstad at great expense and effort; (d) are maintained as confidential and are not generally available to the public or

Randstad's competitors; (e) would provide significant benefit to a competitor seeking to compete with Randstad; and (f) are critical to Randstad's ability to conduct their businesses successfully.

129. As detailed above, Williams transferred and/or wrongfully obtained and accessed Randstad's trade secrets, and BHSG willingly accepted those trade secrets.

130. By disclosing and/or threatening to disclose Randstad's trade secrets to BHSG without Randstad's consent, Williams has misappropriated or threatens to misappropriate Randstad's trade secrets in violation of the DTSA, which allows injunctive relief for actual or threatened misappropriation of trade secrets.

131. Likewise, by willingly receiving Randstad's trade secrets, BHSG has violated the DTSA.

132. The information that the Defendants have misappropriated or threaten to misappropriate describes and relates to Randstad's MSP group, which involve services that are utilized throughout interstate commerce.

133. Should Williams continue to disclose or threaten to disclose Randstad's trade secrets, and should BHSG continue to receive those trade secrets, the disclosure and receipt of such information will harm Randstad and its legitimate business interests.

134. If information pertaining to Randstad's RCS division is used on behalf of or divulged to BHSG or other competitors of Randstad, it could destroy Randstad's competitive advantage.

135. Because the Defendants' misconduct is ongoing and poses a threat of significant irreparable harm that cannot be compensated by money alone, Randstad requests that this Court grant injunctive relief against the Defendants from actual or threatened disclosure or utilization

of Randstad's trade secrets, in addition to granting Randstad its attorneys' fees and exemplary damages.

**COUNT II– MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF MARYLAND UNIFORM TRADE SECRETS ACT**
**(Against Both Defendants: For Damages and Injunctive Relief)**

136. Randstad repeats and realleges each and every allegation contained in Paragraphs 1 through 135 of the Complaint as if fully set forth herein.

137. Randstad's confidential and proprietary information described above constitutes trade secrets as defined by the Maryland Uniform Trade Secrets Act("MUTSA"), MD Code Ann. § 11-1201(e).

138. Williams acquired Randstad's trade secrets by improper means and without authorization. For example, Williams forwarded highly confidential Randstad information and materials to his personal email accounts, in violation of Randstad's policies regarding protection of confidential information, including but not limited to the policies contained in the Associate Handbook.

139. Upon information and belief, Williams has also used or disclosed Randstad's trade secrets to or on behalf of BHSG, in violation of his obligations under the Agreement and the Associate Handbook, and/or has threatened to misappropriate Randstad's trade secrets in violation of the MUTSA.

140. Upon information and belief, BHSG willingly received those trade secrets knowing that they were improperly obtained by Williams in violation of his agreement with Randstad, and may have even directed Williams to improperly acquire those trade secrets.

141. The information that Williams has, upon information and belief, used on behalf of or provided to BHSG, or threatens to use on behalf of or provide to BHSG, regarding Randstad's RCS division constitutes a trade secret within the meaning of the MUTSA. Such information

derives independent economic value from not being generally known to, or readily ascertainable by proper means by, the public; other persons can obtain economic value from its disclosure or use; and it is the subject of significant efforts to maintain its secrecy.

142. As detailed above, Randstad takes reasonable and appropriate measures to protect the confidentiality of the above-described trade secrets.

143. The Defendants knew or should have known that Randstad's trade secrets (a) are confidential; (b) were acquired under circumstances giving rise to a duty to maintain their secrecy or limit their use; (c) were developed or acquired by Randstad at great expense and effort; (d) are maintained as confidential and are not generally available to the public or Randstad's competitors; (e) would provide significant benefit to a competitor seeking to compete with Randstad; and (f) are critical to Randstad's ability to conduct their businesses successfully.

144. As detailed above, Williams transferred and/or wrongfully obtained and accessed Randstad's trade secrets, and BHSG willingly accepted those trade secrets.

145. By disclosing and/or threatening to disclose Randstad's trade secrets to BHSG without Randstad's consent, Williams has misappropriated or threatens to misappropriate Randstad's trade secrets in violation of the MUTSA.

146. Likewise, by willingly receiving Randstad's trade secrets, BHSG has violated the MUTSA.

147. The information that the Defendants have misappropriated or threaten to misappropriate describes and relates to Randstad's MSP group, which involve services that are utilized throughout interstate commerce.

148. Should Williams continue to disclose or threaten to disclose Randstad's trade secrets, and should BHSG continue to receive those trade secrets, the disclosure and receipt of such information will harm Randstad and its legitimate business interests.

149. If information pertaining to Randstad's RCS division is used on behalf of or divulged to BHSG or other competitors of Randstad, it could destroy Randstad's competitive advantage.

150. Because the Defendants' misconduct is ongoing and poses a threat of significant irreparable harm that cannot be compensated by money alone, Randstad requests that this Court grant injunctive relief against the Defendants from actual or threatened disclosure or utilization of Randstad's trade secrets, in addition to granting Randstad its attorneys' fees and exemplary damages.

**COUNT III: BREACH OF CONTRACT**
**(Against Williams - For Damages and Injunctive Relief)**

151. Randstad repeats and realleges Paragraphs 1 through 150 above and incorporates them as if fully set forth herein.

152. Williams entered into a valid and enforceable employment agreement, the Agreement, for valuable consideration.

153. The covenants contained in the Agreement remain in full force and effect.

154. Randstad satisfied all of its obligations under the terms and conditions of the Agreement.

155. By the acts described above, Williams has breached the Agreement by, among other things, joining BHSG to directly compete with Randstad in the prohibited "Work Territory" during the twenty-four month period following the termination of his employment with Randstad.

156. By the acts described above, Williams has also breached the Agreement by, among other things, soliciting Ethridge to resign from Randstad and to accept employment with BHSG, and by soliciting, directly or indirectly, Randstad's customers.

157. By the acts described above, Williams has also breached the Agreement by, among other things, using and/or disclosing Randstad's confidential information and trade secrets to or on behalf of BHSG.

158. As a result of Williams's breach of contract, Randstad has suffered monetary damages and has suffered substantial and irreparable injury and is threatened with further substantial and irreparable injury due to Williams's continued breach of the non-solicitation, noncompetition, and confidentiality provisions of the Agreement.

159. By reason of the foregoing, Randstad requires injunctive relief. Unless injunctive relief is granted, Randstad will be irreparably harmed in a manner not fully compensable by money damages. In addition, Randstad has been damaged in an amount to be determined at trial.

**COUNT IV: TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS**
**(Against BHSG - For Damages and Injunctive Relief)**

160. Randstad repeats and realleges Paragraphs 1 through 159 above and incorporates them as if fully set forth herein.

161. Randstad had a valid contract with Williams.

162. BHSG had knowledge of the non-compete, non-solicitation, and confidentiality provisions of the Agreement.

163. BHSG induced Williams to breach his agreement by soliciting Williams to accept employment with BHSG in violation of the non-compete provision of the Agreement; by colluding with Williams to solicit Ethridge in violation of the non-solicit provision of the

Agreement; and by colluding with Williams to misappropriate Randstad's confidential information and trade secrets in violation of the confidentiality provision of the Agreement.

164. BHSG's interference was improper in means and motive.

165. As a result of BHSG's intentional interference with Randstad's contractual relations with Williams, Randstad has suffered substantial and irreparable injury and is threatened with further substantial injury due to BHSG's continued interference with Randstad's contractual relationships with its employees.

166. By reason of the foregoing, Randstad requires injunctive relief. Unless injunctive relief is granted, Randstad will be irreparably harmed in a manner not fully compensable by money damages. In addition, Randstad has been damaged in an amount to be determined at trial.

**COUNT V: UNFAIR COMPETITION**
**(Against BHSG - For Damages and Injunctive Relief)**

167. Randstad repeats and realleges Paragraphs 1 through 166 above, and incorporates them as if fully set forth herein.

168. BHSG's activities as set forth above constitute unlawful unfair competition.

169. Specifically, BHSG induced Williams to breach his agreements with Randstad, namely, the non-compete, non-solicit, and confidentiality provisions contained therein, and by hiring Williams with the intent of so doing, and thereby tortiously interfered with Randstad's contractual relationship.

170. Additionally, BHSG has unfairly competed with Randstad by misappropriating its confidential information and trade secrets in an effort to create an MSP group that will compete with Randstad.

171. Indeed, the similarities between the BH Solutions website and Randstad's own marketing materials makes it obvious that BHSG is attempting to create a carbon copy of

Randstad's own innovative mid-market MSP group, without devoting the time, money, and effort that was required of Randstad to develop its unique solution.

172. BHSG took the aforementioned actions to gain an unfair competitive advantage over Randstad, to wit, to create its new mid-market MSP group off the ground far sooner, and for far less money, than it would have been able to do had it grown the business organically.

173. As a result of BHSG's unfair competition, Randstad has suffered monetary damages and has suffered substantial and irreparable injury and is threatened with further substantial and irreparable harm, for which there is no adequate remedy at law to compensate.

174. By reason of the foregoing, Randstad requires injunctive relief. Unless injunctive relief is granted, Randstad will be irreparably harmed in a manner not fully compensable by money damages. In addition, Randstad has been damaged in an amount to be determined at trial.

**COUNT VI: INJUNCTIVE RELIEF**
**(Against Both Defendants)**

175. Randstad repeats and realleges Paragraphs 1 through 174 above, and incorporates them as if fully set forth herein.

176. If Williams is permitted to continue breaching his obligations to Randstad, and if BHSG is permitted to continue its unfair competition with Randstad, Randstad will suffer immediate and irreparable harm, for which no adequate remedy at law exists.

177. The balance of the equities weighs heavily in favor of Randstad because, among other things, Williams agreed to be bound by the obligations contained in the Agreement, and because equity will only allow BHSG to engage in fair competition.

178. Injunctive relief is in the public interest because there is a strong public policy in favor of a company being able to protect its confidential and proprietary information, and competing fairly.

179. Injunctive relief is appropriate because there is a substantial likelihood that Randstad will prevail on the merits of its dispute with Defendants.

180. On the basis of the foregoing, Randstad is entitled to temporary, preliminary and permanent injunctive relief, including the issuance of an order enjoining BHSG from operating or marketing a mid-market MSP involving Williams, Keliher, or Ethridge until November 4, 2018, as well as an order enjoining Williams from directly or indirectly, alone or in concert with others, engaging in the following activities: (1) working for BHSG providing services competitive to those he provided for Randstad in the Work Territory until November 4, 2018; (2) further accessing, using, disclosing, revealing, copying, or misappropriating or threatening to misappropriate any Randstad trade secrets or confidential information; (3) soliciting, doing business with, attempting to solicit or do business with, Randstad customers or prospective customers with whom Williams had material contact during the last 2 years of his employment with Randstad; (4) soliciting or attempting to solicit any Randstad employees with whom Williams had business contact during the last 2 years of his employment with Randstad; (5) and soliciting or attempting to solicit any Randstad employment candidate ("Talent") with whom Williams had business contact during the last 2 years of his employment with Randstad.

## PRAYER FOR RELIEF

Wherefore, Randstad respectfully requests that this Court:

1) Grant Randstad an injunction enjoining Williams, and those in active concert or participation with him, including, without limitation, BHSG, from providing competitive services to those he provided for Randstad in the prohibited Work Territory (New York, New Jersey, Pennsylvania, Delaware, Maryland, Washington D.C., Virginia, North Carolina, South Carolina, Georgia, and Texas) for himself or any third party until November 4, 2018, or any other period of time that the Court deems reasonable;

2) Grant Randstad an injunction enjoining Williams, and those in active concert or participation with him, including, without limitation, BHSG, from further accessing, using, disclosing, revealing, copying, or misappropriating or

threatening to misappropriate any Randstad trade secrets or confidential information;

3) Grant Randstad an injunction ordering Williams, and those in active concert or participation with him, including, without limitation, BHSG, to immediately return all Randstad property that he has in his possession, and to verify in writing that he has returned all such information and has retained no copy, or if not, provide an accounting for any such information that cannot be returned;

4) Grant Randstad an injunction enjoining Williams, and those in active concert or participation with him, including, without limitation, BHSG, from directly or indirectly soliciting, doing business with, attempting to solicit or do business with, Randstad customers or prospective customers with whom Williams had material contact during the last 2 years of his employment with Randstad;

5) Grant Randstad an injunction enjoining Williams, and those in active concert or participation with him, including, without limitation, BHSG, from directly or indirectly soliciting or attempting to solicit any Randstad employees with whom Williams had business contact during the last 2 years of his employment with Randstad;

6) Grant Randstad an injunction enjoining Williams, and those in active concert or participation with him, including, without limitation, BHSG, from directly or indirectly soliciting or attempting to solicit any Randstad employment candidate ("Talent") with whom Williams had business contact during the last 2 years of his employment with Randstad;

7) Grant Randstad an injunction enjoining BHSG from operating or marketing a mid-market MSP involving Williams, Keliher, or Ethridge until November 4, 2018, or any other period of time that the Court deems reasonable;

8) Enter judgment in favor of Randstad and against the Defendants for actual damages caused by Defendants' actions in an amount to be proven at trial;

9) Award Randstad pre-judgment and post-judgment interest, as well as punitive damages in an amount to be determined at trial;

10) Award Randstad the costs of this proceeding, and reasonable attorneys' fees pursuant to statute and contract; and

11) Award Randstad all other and further relief as this Court may deem just and proper.

[VERIFICATION ON FOLLOWING PAGE]

Respectfully submitted,

RANDSTAD GENERAL PARTNER (US), LLC,
By its Attorneys,

*/s/ Edward V. Arnold*

Edward V. Arnold (VSB # 80087)
SEYFARTH SHAW LLP
975 F Street, NW
Washington, D.C. 20004-1454
Telephone: (202) 463-2400
Facsimile: (202) 828-5393

Date: March 10, 2017

Erik W. Weibust (to be admitted *pro hac vice*)
Dawn Mertineit (to be admitted *pro hac vice*)
SEYFARTH SHAW LLP
Two Seaport Lane, Suite 300
Boston, Massachusetts 02210
Telephone: 617-946-4800
Facsimile: 617-946-4801
eweibust@seyfarth.com
dmertineit@seyfarth.com

## VERIFICATION

I, Shirley Jones, President of Randstad Corporate Services, have read the allegations contained herein and, under the pains and penalties of perjury, I swear that the above allegations are true and accurate, except those alleged upon information and belief and Paragraphs 83, 88, 91, and 105, and as to those, I believe them to be true. Unless otherwise stated, the allegations contained herein are based upon my personal knowledge or upon the business records of Randstad General Partner (US), LLC, and its affiliates.

Signed under the pains and penalties of perjury this 10 day of March 2017.

Shirley Jones