**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| RANDSTAD GENERAL PARTNER (US), LLC, Plaintiff, | ) | |
| v. | ) | CASE NO. 1:17-cv-680 |
| JOHN WILLIAMS and BEACON HILL STAFFING GROUP, LLC, Defendants. | ) | |

**RANDSTAD GENERAL PARTNER (US), LLC'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Edward V. Arnold (VSB # 80087)
SEYFARTH SHAW LLP
975 F Street, NW
Washington, D.C. 20004-1454
Telephone: (202) 463-2400
Facsimile: (202) 828-5393
earnold@seyfarth.com

Erik W. Weibust (to be admitted *pro hac vice*)
Dawn Mertineit (to be admitted *pro hac vice*)
SEYFARTH SHAW LLP
Two Seaport Lane, Suite 300
Boston, Massachusetts 02210
Telephone: 617-946-4800
Facsimile: 617-946-4801
eweibust@seyfarth.com
dmertineit@seyfarth.com

Plaintiff Randstad General Partner (US), LLC ("Randstad" or the "Company") hereby submits this memorandum of law in support of its Motion for Temporary Restraining Order and Preliminary Injunction (the "Motion").

## INTRODUCTION

This is a classic case of unfair competition at its worst. Rather than spending the time and capital to build a new mid-market Managed Service Program ("MSP")—a high end offering that Randstad pioneered—defendant Beacon Hill Staffing Group ("BHSG") decided to steal Randstad's. It lured away Randstad's most senior managers in its Randstad Corporate Services ("RCS") division, which houses Randstad's mid-market MSP—an even more specialized offering that has high barriers to entry—on information and belief offering them far greater than market salaries in exchange for Randstad's confidential information and trade secrets.

Indeed, evidencing just how surreptitious BHSG was being, it told at least one of these employees not to inform Randstad that they were joining BHSG for at least 30 days, ostensibly so that BHSG could get the new division up and running before Randstad could obtain legal relief or shore up its client relationships. Defendant John Williams ("Williams") did not tell Randstad his plans (likely because his work for BHSG in the manner in which he was hired to do constitutes a direct violation of his non-compete agreement), nor did he update his LinkedIn page to indicate where he had gone until several weeks later, even then not indicating that he would be forming a competing mid-market MSP for BHSG, which did not previously have one. Indeed, it was not until the very end of February that Randstad finally discovered what Williams was up to. The website for this new group at BHSG lists Williams and Kathleen Keliher ("Keliher"), another former Randstad employee, as its sole employees, touts their experience at Randstad, and effectively parrots Randstad's own marketing materials.

If that were not enough, BHSG, on information and belief, has recently hired yet another employee of Randstad, Cristina Ethridge ("Ethridge"), who had access to some of RCS's most sensitive and high-level information. This is no coincidence, as Ethridge had worked closely with Keliher and Williams at Randstad. Indeed, she was not in a public-facing role, and thus the only logical conclusion is that Williams (and Keliher) solicited her, either directly or indirectly, in violation of his agreement with Randstad. Williams will inevitably, intentionally or otherwise, use and/or disclose Randstad's confidential information and trade secrets on behalf of BHSG in order to get its new MSP off the ground far sooner, and for far less money, than it would have been able to do had it grown the business organically. This is the *sine qua non* of unfair competition—BHSG has "reap[ed] where [Randstad] has sown" and "gather[ed] where [Randstad] has strewn," *Lowry's Reports, Inc. v. Legg Mason, Inc.*, 271 F. Supp. 2d 737, 754-5 (D. Md. 2003)—and it must be stopped.

## FACTUAL BACKGROUND

### I. Randstad's Confidential Information and Trade Secrets

Randstad is a leader in the staffing solutions industry, providing individual employees ("Talent") to a diverse portfolio of businesses and organizations ("Customers") nationwide on a temporary or permanent basis to meet the Customers' needs. Verified Complaint ("Cmp."), at ¶ 15. The staffing industry is a highly competitive, specialized business, and through decades of hard work, dedication, innovation, and investment, Randstad has become a leader in the staffing industry. *Id.* at ¶ 16.

One of Randstad's operating companies is Randstad Sourceright ("Sourceright"), the "solutions" arm for Randstad. *Id.* at ¶ 17. One of Sourceright's offerings is a traditional MSP, which provides support to large companies with substantial staffing needs that extends well beyond traditional contingent workforce supplier management, to cover full spectrum talent

needs, including employee recruiting support, contractor retention programs, supplier engagement strategies, and payrolling services. *Id*. An MSP in the staffing industry refers to an outsourced agency that manages the contingent worker (temporary staffing) program of a client company. *Id.* at ¶ 18. They ensure the smooth day-to-day operations of pulling requirements from clients, the preferred vendors submitting candidates, onboarding of selected candidates and the ongoing management of temporary workers at the client company for the duration of the contract. *Id*. Typically, MSPs—including Sourceright's—are found at large Fortune 1000 companies who might have thousands of contractors and hundreds of staffing agencies to manage. *Id.*

In addition to Sourceright's traditional MSP offering for large companies, RCS offers a distinct MSP, for mid-market companies with similar needs, but on a much different scale. *Id.* at ¶ 19. RCS is unique from other MSPs (including the Sourceright MSP) in that it serves mid-market companies with annual revenues between $5 and $30 million, and provides more direct staffing solutions (as opposed to managing other staffing firms). *Id.* at ¶ 20. Essentially, RCS creates a "mini-branch" at each client to handle the client's staffing needs. *Id.* In other words, RCS is Randstad's unique "hybrid MSP" model, and provides a high touch, people first program that sits on-site with clients to provide a white glove level of service, while managing suppliers and containing costs. *Id.* at ¶ 21. This is unique for mid-market companies. *Id.*

Until mid-2016, RCS had *no* competitors in the mid-market MSP field, and even then, only one other company (arguably) competed with RCS for mid-market companies in the MSP space. *Id.* at ¶ 22. This is not for lack of trying; there are high barriers to entry in the mid-market MSP field, in part because the vendor management system or "VMS" technology used in traditional MSPs was created for much larger companies, due to its cost. *Id.* RCS pioneered the

mid-market MSP by building a specific team to implement VMS technology at a lower cost appropriate for mid-market companies. *Id*. To this day, Randstad is one of only three companies (including, now, BHSG) that offer a mid-market MSP. *Id.*

Randstad expends substantial time, effort, and expense developing confidential business information and trade secrets. *Id.* at ¶ 27. Randstad's trade secrets and confidential information are not generally known in the industry or outside of Randstad, and could be learned by others, if at all, only through the expenditure of considerable time, effort, and expense. *Id.* at ¶ 28. Randstad's trade secrets and confidential information are extremely valuable because Randstad derives economic value from the information not being made public, and any Randstad competitor who acquired such information would be given an unfair competitive advantage. *Id.* at ¶ 29.

Randstad's policies and procedures require that its trade secrets and confidential information be kept strictly confidential by its employees, and Randstad restricts access to such information. *Id.* at ¶ 30. Among other precautions, Randstad requires its employees to enter confidential, personal usernames and passwords in order to gain access to Randstad's server and e-mail accounts. *Id.* at ¶ 31. Randstad further requires employees to enter a second, unique username and password in order to gain access to the confidential, secure CRM database. *Id.* Other confidential databases, including a tool to assist with negotiating customer contracts, are also password protected. *Id*. Additionally, Randstad protects its confidential information by limiting access to physical space at its various offices. *Id.* at ¶ 32. For example, employees must use company-issued badges to enter their office space. *Id.* Randstad employees working out of home offices, such as Williams and Keliher, are required to have a receptionist or fellow colleague grant them access to the office space. *Id*. Randstad also requires employees to execute

employment agreements containing restrictive covenants to protect its confidential information. *Id.* at ¶ 33.

Additionally, Randstad employees are bound by the Randstad Internal Employee Handbook (the "Employee Handbook"), which provides at both Section 4.4 ("Code of Business Conduct") and Section 7.1 ("Confidential & Proprietary Information") that "confidential, proprietary and trade secret information . . . are the exclusive property of Randstad and may not be used and/or disclosed outside the company without express written consent." *Id.* at ¶¶ 34-35. Section 7.1 also lists types of information considered "confidential," including but not limited to research, marketing activities, strategic plans and business and financial performance of any unit of the Company," and states that "Randstad procedures, operations, research findings, sales results, financial performance, strategies and similar non-public information should not be discussed with anyone outside of the company." *Id.* at ¶ 35. That section also provides that "[a]ll confidential and proprietary information of the Company is the property of Randstad even after the employment relationship ends, regardless of the reason," and that employees "have a continuing obligation to respect the confidentiality of information that pertains to the business of Randstad that [they] may have obtained during [their] employment." *Id*. Section 10.1 of the Employee Handbook provides in part that when "employment with Randstad ends, regardless of the reason, all equipment, keys, access cards, etc. belonging to Randstad, including any equipment [the employee has] at home or elsewhere must be returned. Any confidential, proprietary and/or trade secrets information received from Randstad must also be returned." *Id.* at ¶ 36.

Randstad employees are also bound by an "Electronic Communications Policy" that provides that neither voice mail nor e-mail should be used to send or receive trade secrets,

proprietary, financial information or similar materials without prior authorization, and that Randstad's voice mail and e-mail systems are not intended to transmit sensitive or confidential material such as pricing information or trade secrets. *Id.* at ¶ 37. The Electronic Communications Policy also provides that caution and judgment should be exercised when sending confidential or proprietary information inside or outside Randstad, and that it is the employee's responsibility to protect username and password information. *Id.* at ¶ 38.

## II. Williams' Employment with Randstad, Employment Agreement, and Access to Confidential Information

Williams was hired by Randstad on or around January 30, 2012, as an Area Vice President for RCS. *Id.* at ¶ 41. While employed by Randstad, Williams worked out of a home office in Fort Howard, Maryland. *Id.* at ¶ 42. As a condition of his employment, Williams signed a Randstad Safety Net Agreement on or about January 30, 2012 (the "Agreement"). *Id.* at ¶ 43.

The Agreement's "RECITALS" section states that Williams acknowledged that (a) Randstad is in the "highly competitive business of providing employment services for a wide range of short-term, long-term and direct hire positions . . . to companies across the United States; (b) Randstad has developed and will continue to develop the considerable goodwill of its customers, employees, and talent; (c) Williams has participated in and benefited from that development as well as Randstad's training; (d) during his employment with Randstad, he would have access to Randstad's highly valuable Confidential Information that could be used to compete unfairly with Randstad, and which Randstad has expended substantial time, money, and effort to develop and maintain; and (e) Randstad's continuing ability to successfully engage in its business depends on its Confidential Information and its protection from unfair competition. *Id.* at ¶ 45.

Williams also agreed to be bound by a number of obligations to Randstad, in exchange for his “employment and/or continued employment, and the additional consideration of Randstad's promise to provide [Williams] with Confidential Information and training, to which [Williams] is otherwise not legally entitled.” *Id.* at ¶ 46. For example, Section 2 of the Agreement, entitled “Limited Non-Compete,” provides that Williams agrees that during his employment with Randstad and for 2 years thereafter (the “Prohibited Term”), “within the Work Territory,[1] [he] will not compete, directly or indirectly, with the Business of Randstad[2] by performing the same or substantially similar activities” he performed for Randstad during the year prior to his termination of employment. *Id.* at ¶ 47.

Section 3 of the Agreement, entitled “Non-Solicitation of Customers,” provides that for the same timeframe, “[Williams] agrees that, during the Prohibited Term, [he] will not directly or indirectly solicit, do business with, or attempt to solicit or do business with any of Randstad's customers or prospective customers with whom [Williams] had Material Contact[3] during the last twenty-four (24) months of [Williams’] employment with Randstad. This restriction is limited to soliciting or doing business in competition with the Business of Randstad.” *Id.* at ¶ 48.

Likewise, pursuant to Section 4 of the Agreement, entitled “Non-Solicitation of Employees,” Williams agreed that for the Prohibited Term, he would not directly or indirectly solicit or attempt to solicit any Randstad employee with whom he had business contact in the last 2 years of his employment, to terminate employment with Randstad, or to accept employment

[1] “Work Territory” is defined in the Agreement as “each county in which [Williams] worked or provided services on behalf of Randstad in the last year of [his] employment with Randstad.”

[2] “Business of Randstad” is defined in the Agreement as “the business of providing employment services for short-term, long-term and direct hire positions in office, industrial, creative, technical or professional skill practices.”

[3] “Material Contact” is defined in the Agreement as “(1) interaction with the customer in an effort to further a business relationship with Randstad; (2) supervising Randstad's relationship with the customer; (3) supervising Employees who interacted with the customer in an effort to further a business relationship with Randstad; or (4) learning Confidential Information about the customer in the course of [Williams’] employment with Randstad.”

with any Randstad competitor. *Id.* at ¶ 49. Section 5 of the Agreement, entitled "Non-Solicitation of Talent," provides that for the Prohibited Term, Williams will not directly or indirectly solicit or attempt to solicit any Randstad Talent with whom he had business contact in his last 2 years of employment, for the purpose of encouraging, enticing, or causing said Talent to terminate employment with Randstad, or to accept work assignments from any Randstad competitor. *Id.* at ¶ 50.

Section 6 of the Agreement, entitled "Non-Disclosure of Confidential Information and Trade Secrets," prohibits Williams from "reproduc[ing], us[ing], distribut[ing], disclos[ing], publish[ing], misappropriat[ing] or otherwise disseminat[ing] any Confidential Information except on behalf of Randstad." *Id.* at ¶ 51.

Section 8 of the Agreement requires Williams to return any confidential information or trade secrets upon termination of his employment, "including copies, and any desktops, laptops, cell phones, Blackberries, or other personal hand-held devices which Randstad provided to [Williams] for use while at Randstad." *Id.* at ¶ 52.

Under Section 9 of the Agreement, entitled "Remedies for Breach of Contract," Williams agreed that the restrictive covenants are reasonable, and that any breach thereof would "bestow an unfair competitive advantage upon any person or entity, which might benefit from such violation, and would necessarily result in substantial and irreparable damage and loss to Randstad." As such, Williams agreed that "Randstad shall be entitled to an injunction restraining [him] from such breach or threatened breach, as well as recovery of its costs and reasonable attorneys' fees." *Id.* at ¶ 53.

Section 10 of the Agreement, entitled "Effect of Violations by Employee," further provides that Randstad is entitled to recover its attorneys' fees if Randstad is required to bring an

action to enforce the Agreement. *Id.* at ¶ 54.

Never once did Williams ever tell Randstad that he did not understand anything in the Agreement or that he did not intend to comply therewith. *Id.* at ¶ 57. Had he done so, Williams would not have been provided with access to Randstad's confidential information and trade secrets, or to its Customers and Talent. *Id*. Indeed, he likely would have been terminated. Randstad reasonably believed that Williams did, in fact, understand and intend to comply with the Agreement in its entirety, and reasonably relied thereon in continuing to employ him and to provide him with access to its confidential information and trade secrets, and access to its Customers and Talent. *Id*.

Williams was also bound by the provisions of the Employee Handbook, discussed *supra* Section I. *Id.* at ¶ 58. In fact, Williams signed an acknowledgement on January 24, 2012 representing that he was aware that the Employee Handbook was accessible on the Randstad intranet website, that on request, he could receive a hard copy from Human Resources, and that he had read it and was familiar with its terms and conditions. *Id*.

As an Area Vice President, Williams was responsible for managing RCS's mid-Atlantic region (covering New York, New Jersey, Pennsylvania, Delaware, Maryland, Washington D.C., Virginia, North Carolina, and South Carolina), including driving profitable growth, managing a P&L, and maintaining relationships with C-level contacts within the client's organization while ensuring consistent RCS product delivery and compliance. *Id.* at ¶ 59. In this role, Williams was a field leader, and was also responsible for hiring his team, overseeing the team's operations, and expanding the team's customer base. *Id*. In February 2013, Williams was promoted to Regional Vice President of RCS. *Id.* at ¶ 60. In addition to his prior responsibilities, Williams helped design RSC's MSP strategy. *Id.* In November 2015, Williams was promoted again to

Senior Regional Vice President of RCS, which expanded his territory to include Texas and Georgia, in addition to the mid-Atlantic region. *Id.* at ¶ 61. In that role, Williams directly oversaw 8 employees, and indirectly oversaw 30 employees. *Id.*

Williams worked closely with Keliher; in fact, Keliher, who was in more of a sales role, would often bring Williams in as a "field expert" to collaborate on prospects. *Id.* at ¶ 62. After his promotion, Williams sat on the five member executive committee (which later expanded to eight members) with Keliher and RCS President Shirley Jones ("Jones"), among other people. *Id.* at ¶ 63. He was one of the most senior level employees in RCS, and was provided with access to some of Randstad's most sensitive information. *Id*. This executive committee set RCS's overall strategy, identified RCS's approach to the market, discussed its operations, sales, financials, client retention strategy, and competitive trends, and defined its solutions. *Id*. Some of RCS's most sensitive information was discussed at executive committee meetings. *Id.*

While employed by Randstad, and particularly in his role as Senior Regional Vice President and executive committee member, Williams was given access to Randstad's trade secrets and confidential information, including but not limited to details regarding RCS's operations, structure, strategy, financial information, and future plans. *Id.* at ¶ 64. The confidential information to which Williams had access during his employment with Randstad constitutes trade secrets that are critical to Randstad's competitive position in the staffing industry. *Id.* at ¶ 65.

If Randstad's trade secret information were to fall into the hands of a competitor, such as BHSG, Randstad's competitive position would be severely harmed, and the competitor would be able to trade on many years' worth of valuable accumulated knowledge. *Id.* at ¶ 6. Likewise, if a former employee, such as Williams, retained Randstad's confidential trade secrets after his

employment ended, and he accessed them while working for a competitor, Randstad's competitive position would be seriously harmed. *Id.*

**III. Ethridge's Employment with Randstad and Access to Confidential Information**

Ethridge was hired by Randstad Professionals US, LP ("Randstad Professionals") in June 2011 as a Business Development Specialist in the Customer Intelligence division, which provides full lifecycle sales support to build and expand client relationships across the organization. *Id.* at ¶ 67. Ethridge was responsible for responding to requests for proposals (RFPs), creating presentations to accompany proposals, collecting and coordinating legal documentation, acting as a liaison for corporate information, conducting market and industry research and providing guidance on industry trends, and serving as an advisor to the field. *Id.* In January 2014, Ethridge was promoted to Junior Business Development Team Lead, On-Site and Master Vendor Solutions. *Id.* at ¶ 68. In addition to her previous responsibilities, in this role, Ethridge led the on-site and MSP vertical of her team, working as a business partner to field sales and management leaders to ensure the materials the team created were competitive, uniquely customized, and representative of the client-specific solutions crafted for each customer. *Id.* Ethridge was also required to mentor and monitor junior personnel, review and edit proposal content, conduct performance evaluations, and assist in the development of best practices surrounding the team's core competencies. *Id.* In April 2016, Ethridge was again promoted, this time to Business Development Team Lead. *Id.* at ¶ 69. In that role, in addition to her other responsibilities, she led the MSP and healthcare solutions vertical of the team. *Id.*

Ethridge had access to some of Randstad's most sensitive information, including a listing of each RCS account and prospect, and location and financial information associated with those accounts; revenue by week; Randstad's presentation decks, and all of the data that was utilized in each of Randstad's responses to RFPs from customers and prospective customers (which

included such information as RCS's largest customers, its prospects, pricing information and strategy, etc.). *Id.* at ¶ 70. In fact, Ethridge was responsible for *all* of RCS's RFP responses, and thus had a unique view into RCS that few, if any, other employees had. *Id*. For example, prior to her resignation, Ethridge was working on an RFP for a customer worth *billions* of dollars. *Id*. Simply put, Ethridge had access to a volume of confidential and proprietary information that virtually no one else at Randstad would have. *Id.* at ¶ 71.

As a condition of her employment with Randstad, Ethridge signed a letter agreement on May 23, 2011 (the "Ethridge Agreement") agreeing, among other things, that she will not use or disclose Randstad's confidential information for her own benefit or the benefit of any unauthorized third party. *Id.* at ¶¶ 72-73. The Ethridge Agreement also provides that upon termination of her employment, Ethridge will return "all records, papers, documents, data and all other property in [her] possession which belongs to Randstad Professionals US and which contain any confidential information," and prohibits her from removing "any papers, documents, data or records of any kind, or any copies or reproductions."[4] *Id.* at ¶ 74. On information and belief, Williams was aware of Ethridge's contractual obligations. *Id.* at ¶ 76.

Ethridge was also bound by the Randstad Associate Handbook (the "Associate Handbook"), and acknowledged her receipt thereof. *Id.* at ¶ 77. Section 11.1 of the Associate Handbook governs the care and security of confidential information. *Id.* at ¶ 78. Section 11.2 of the Associate Handbook provides in part that "[a]ssociates may not misuse or make unauthorized disclosures of non-public, confidential information (including trade secrets) that is acquired during the course of employment with Randstad. . . . Examples of confidential information

[4] The Ethridge Agreement further provides if she fails to abide by her responsibilities set forth therein, "Randstad Professionals US will be entitled to immediate temporary and permanent injunctive relief preventing any further violation of [her] responsibilities, as well as any money damages which it incurs as a result of [her] actions. [Ethridge] will also forfeit all unpaid compensation in any form through the date of the breach." *Id*. at ¶ 75.

include, but are not limited to, non-public, proprietary details about Randstad and/or its client's strategies, operational plans, pricing, financial information and forecasts, personnel information, payroll information, personally identifiable information, protected health information and trade secrets. . . . Any such materials must be returned to Randstad prior to leaving Randstad." *Id.* at ¶ 79. On information and belief, Williams was aware of Ethridge's obligations under the Associate Handbook. *Id.* at ¶ 81.

Ethridge, while not formally a part of RCS, nevertheless worked very intimately with both Williams and Keliher. *Id.* at ¶ 82. Accordingly, as discussed above, Ethridge had intimate knowledge of RCS's inner workings and strategies and the MSP offering as a whole, and she was responsible for ***every single*** RCS RFP response, prepared presentation decks for client pitches, and collected and maintained customer and market data for the MSP group, all of which were highly confidential. *Id*. She effectively knows everything there is to know about the RCS division and its MSP offering, and could harm Randstad substantially if she were to use or disclose such information to or on behalf of a competitor, even if inadvertently. *Id.*

## IV. <u>Williams and Keliher Resign from Randstad</u>

On November 4, 2016, Williams resigned to his supervisor, Alp Perahya ("Perahya"); however, it was initially unclear whether Williams had actually resigned because he was so evasive and unclear. *Id.* at ¶ 83. Shortly thereafter, Jones attempted to speak with Williams to confirm whether he was resigning. Williams emailed Jones and Perahya on November 8, 2016 stating that his resignation was "an irreversible decision." *Id.* at ¶ 84. Perahya responded to ask about Williams' exit plan, last day, and communication plan. *Id.* at ¶ 85. Williams never replied. *Id*. Likewise, despite Jones' numerous attempts to contact Williams to discuss his resignation, and despite Williams' promises to find time to communicate with Jones, Williams never connected with her. *Id.* at ¶ 86. Williams failed to provide any notice of his resignation.

*Id*. at ¶ 87.

Also on November 4, 2016, in what was ostensibly a coordinated effort with Williams, Keliher likewise resigned to her immediate supervisor, Jane Ligrani ("Ligrani"), although like Williams, her resignation was also very vague. *Id.* at ¶ 88. Keliher informed Ligrani that she was "done," but that she was too emotional about it and could not discuss it further. *Id.* On November 5, Ligrani asked Keliher to confirm that her last day with Randstad was November 4. Keliher confirmed this. *Id.* at ¶ 89. In other words, Keliher also failed to provide any notice of her resignation. *Id.*

On November 5, 2016, Keliher exchanged several text messages with Jones, who was Keliher's former direct supervisor. *Id.* at ¶ 90. Keliher told Jones that she was going to a smaller company, and that she would never join one of Randstad's bigger competitors. *Id.* However, Keliher refused to identify her new employer, and admitted that its CEO had instructed her not to divulge its identity for 30 days. *Id.* Keliher did not say what she would be doing at this smaller company. *Id.* Keliher also told Cheryl MacMillan, Senior Vice President of RCS, that the CEO of her new employer instructed her not to share its identity for 30 days. *Id.* at ¶ 91.

## V. <u>Williams and Keliher Join BHSG</u>

Several weeks after Keliher resigned, Jones noticed that Keliher had finally updated her LinkedIn profile to reflect that she had joined BHSG. *Id.* at ¶ 92. However, at that time, Keliher's profile did not reflect which BHSG business line she was employed in, which Jones found curious. *Id.* BHSG did not at the time have a mid-market MSP, nor was there any indication on its website or in press releases that it was intending to form one. *Id.* As such, Jones reasonably believed that Keliher would be working in a different business line. *Id.* Similarly, Jones noticed that Williams' LinkedIn profile reflected that he, too, had joined BHSG, but just like Keliher, his profile also did not reflect which BHSG business line he was

employed in. *Id.* at ¶ 93. Again, Jones reasonably assumed that he, too, would be working in an existing BHSG business line. *Id.*

Jones viewed Keliher's and Williams' LinkedIn profiles again very recently, at the end of February. *Id.* at ¶ 94. Jones discovered that Keliher had updated her profile to reflect that she was the Managing Director and Executive Vice President of "BH Solutions." *Id.* This was the first time Jones had ever heard of this group, and an internet search confirms that there were no prior public announcements of such. *Id.* As of the date of this filing, Williams' LinkedIn profile still does not reveal that he is working for BH Solutions. *Id.* at ¶ 95.

BHSG's website makes it clear that its new solutions group is virtually a carbon copy of RCS. For example, the BHSG website states:

> Beacon Hill Solutions provides **customized**, **high-touch**, **on-site**[5] talent and **supplier management solutions** to clients across the country. With a completely **flexible** and **scalable** approach, our **integrated total-talent programs** address the unique needs of our clients, while delivering a **consultative partnership** that brings together a **single point of contact**, seamless supplier coordination, and true transparency and visibility with an evolved **VMS technology**.[6]
>
> …
>
> To remain competitive in today's market for talent, companies must maintain **agility** while maximizing their workforce across an entire enterprise. When **separate delivery silos** become inefficient, our **Integrated Talent Solutions** model allows for a modular, **flexible**, and **customized** approach to address client talent supply chain needs across an organization including contingent workers, full-time workforce, independent contractors and consultants, SOW, freelancers and payrolled workers.[7]
>
> …
>
> Our **consultative** and **customized** approach allows us to design and architect a solution specific to each client's unique environment, providing all of the benefits

[5] All bolding to BHSG's and Randstad's website descriptions has been added to highlight similarities to Randstad's own proprietary marketing materials.

[6] https://www.beaconhillstaffing. com/BH-Specialties/BH-Solutions/Solutions-Home

[7] https://www.beaconhillstaffing.com/BH-Specialties/BH-Solutions/Solutions-Capabilities/ Offerings-Delivery-Models#ITS

of a managed program with a **high-touch, white glove** approach.[8]

This language is eerily reminiscent of RCS's and Sourceright's own marketing materials:

- "Randstad Corporate Services (RCS) delivers comprehensive **onsite** strategic **supplier management** and human capital solutions. Our innovative model aligns **single point-of-contact service** delivery with robust **VMS technology** that may be customized to meet your total staffing needs. We are a highly **consultative staffing partner** with a commitment to exceptional customer service and program **flexibility**."[9]
- "Randstad Sourceright is on the forefront of delivering total talent solutions designed to drive business **agility**, **scalability**, and **flexibility**."[10]
- "A prescriptive approach to the 'right' talent will narrow the possibilities; **pre-defined silos** or classifications will only get in the way of progress and limit your competitiveness. Today's **integrated talent solutions** are not the simple blend of RPO and MSP, they are game-changers, specially designed to take on a total business view. In the emerging field of **integrated talent solutions**, we have hands-on success bringing this total view to organizations across industries and around the world."[11]
- "[T]he **high-touch approach** brings the strategy to a new level, providing dedicated **on-site** resources to act as the complete fulfillment function for client talent needs. This includes all aspects of **flexible** talent, including contingent workers, SOW and freelance workers, as well as direct permanent hire recruitment. The result is a 'one-stop shop' that enables a **seamless** process and **single-point** resource for addressing all talent needs."[12]
- "RCS offers our partners **single-point-of contact** access to comprehensive staffing services through an **onsite, customized total talent solution** and **white glove service!**"[13]

The similarity between Beacon Hill Solutions' website and Randstad's own website and other marketing materials is uncanny, and no doubt intentional.

BHSG's website now features a biography of Keliher on the Beacon Hill Solutions page, which states, in part:

> Ms. Keliher is responsible for leading and directing Beacon Hill Solutions and its national expansion. With more than 15 years in the staffing industry, she is considered an expert in architecting and delivering complex industry leading

---

[8] https://www.beaconhillstaffing.com/BH-Specialties/BH-Solutions/Solutions-Capabilities/Our-Commitment

[9] https://www.randstadusa.com/staffing-and-solutions/workforce-solutions/on-site-management/corporate-onsite-management/

[10] https://www.randstadsourceright.com/our-solutions/integrated-talent-solutions/)

[11] https://www.randstadsourceright.com/our-solutions/integrated-talent-solutions/

[12] http://insights.randstadsourceright.com/h/i/288117993-the-evolving-model-of-msp-and-total-talent-partnership

[13] https://www.randstadusa.com/jobs/search/rsr/onsite-recruiter-account-manager-mspvms_berlin_13130429/

> solutions. She is known for her customized high touch approach by always putting her clients' needs first. She works with clients of various sizes and scopes to deliver a solution that is unique to their needs including MSP/VMS, Master Vendor, RPO, SOW, 1099 and Pay Rolling. She is creative in her approach and excels at solving complex client problems by bundling solutions together to bring a comprehensive total talent approach to her clients. Prior to joining Beacon Hill, Ms. Keliher was a VP of Sales and member of the Executive Committee for the solutions and services division of the 2nd largest workforce company in the world, where she was responsible for the development, growth, and management of the sales strategy, helping to build the business from concept to more than 50 clients nationally exceeding 400M spend under management.

Cmp. at ¶ 101. Likewise, the BHSG website now features a bio of Williams on the Beacon Hill Solutions page, which states in part:

> Mr. Williams is responsible for leading and directing delivery, client service, and operations across the country for Beacon Hill Solutions. As one of Beacon Hill Solutions' founding executives, he also serves on its advisory committee. With almost two decades in the staffing industry, managing both branch and strategic engagements across all verticals, Mr. Williams is known for building high performing teams and collaborating with client partners to design customized solutions specific to their unique needs. His commitment to bringing best practices and partnership evolution to all engagements has earned him many accolades and awards throughout his career. Prior to joining Beacon Hill, Mr. Williams served as a senior regional vice president for one of the world's largest global staffing organizations. In this former role, he served on their executive committee while leading the largest region for its fastest-growing solutions division, creating blended delivery operations across multiple services for the mid-market to large Fortune 500 companies across the United States.

*Id.* at ¶ 102. These two bios are the only ones on the Beacon Hill Solutions Leadership page,[14] which, on information and belief, was only made public in mid-February of 2017. *Id.* at ¶ 103. Upon information and belief, BHSG purposefully waited until months after Williams and Keliher had resigned to make this page public in an effort to lull Randstad into inaction. *Id.* This was likely why BHSG's CEO told Keliher (and later, Ethridge) not to tell Randstad where she would be working. *Id.* Upon information and belief, Williams is working for BHSG out of its Washington, DC office, and is servicing clients in the same territories he served while

[14] Available at https://www.beaconhillstaffing.com/BH-Specialties/BH-Solutions/Leadership

employed by Randstad (i.e., the mid-Atlantic, Georgia, and Texas). *Id.* at ¶ 104.

## VI. <u>Ethridge Resigns And, On Information And Belief, Joins BHSG</u>

On or about February 13, 2017, Ethridge submitted her resignation to Randstad and stated that her last day would be March 3, 2017. *Id.* at ¶ 105. At that time, just as Keliher had stated when she resigned, Ethridge informed Randstad that the CEO of her new employer, which she acknowledged was a competitor, had instructed her not to disclose where she would be working for 30 days. *Id*. On February 22, 2017, Ethridge was terminated and her access to Randstad's computer system and e-mail was cut off. *Id.* Upon information and belief, Ethridge intends to join, or has already joined, BHSG's nascent MSP group, along with Keliher and Williams. *Id.* at ¶ 106.

Upon information and belief, Williams solicited Ethridge, whether directly or indirectly, to join BHSG's MSP group, in direct violation of his non-solicitation obligation to Randstad. *Id.* at ¶ 107. Indeed, Ethridge was not in a public-facing role at Randstad, and thus only someone who knew her work, ostensibly by working with her at Randstad, would have known of her and the value that she could provide to a burgeoning MSP group such as Beacon Hill Solutions. *Id*. In other words, it would have been virtually impossible for BHSG to have stumbled across Ethridge unless Williams told BHSG to recruit her, which would constitute indirect solicitation in violation of the Agreement. *Id.* Indeed, Williams may have even solicited her directly. *Id*.

On or about March 3, 2017, Randstad sent Ethridge a letter reminding her of her continuing obligations to Randstad, including, but not limited to, her obligation to return any property belonging to Randstad. *Id.* at ¶ 108. In response, by letter dated March 7, 2017, Ethridge returned 103 pages of documents belonging to Randstad, including but not limited to a highly confidential, 76-page RFP response dated May 27, 2016, which is labeled "Proprietary

and confidential" at the bottom of each page. *Id.*

## VII. Randstad's Forensic Review

Upon learning of Williams' plans to work for BHSG as part of its new MSP group, Randstad commenced a forensic review of his electronic activities prior to resigning. *Id.* at ¶ 109. Randstad's forensic review is ongoing; however, Randstad has already discovered that Williams improperly forwarded highly confidential information to his personal email address shortly before resigning. *Id.* at ¶ 110.

On September 29, 2016 (just 5 weeks before resigning from Randstad, and undoubtedly after he had already begun talking to, if not received an offer from, BHSG), Williams forwarded to his personal email account an email that he received on his Randstad email account from another Randstad employee attaching a confidential PowerPoint presentation entitled "Randstad Centralized Delivery." *Id.* at ¶ 111. This presentation, which was personalized based on the RCS accounts Williams was responsible for, described the design and structure of Randstad's Centralized Delivery model (a lower cost way to make placements, which is only just now being rolled out internally within Randstad) and how it would support Williams' specific accounts and programs. *Id*. This presentation is internal only, highly confidential and proprietary, and should not have been forwarded to Williams' personal email. *Id.* Specifically, this presentation presents various scenarios regarding Williams' accounts, including how the new delivery model would be implemented in those accounts. *Id.* This presentation contained highly confidential Randstad information that would be extremely valuable to a competitor, in particular a new market entrant such as BHSG.[15] *Id.*

[15] Similarly, and no doubt in coordination with Williams, on September 26, 2016 (just a few weeks before resigning from Randstad, and undoubtedly after she, too, had already begun talking to, if not received an offer from, BHSG), Keliher forwarded to her personal email account an email that she (along with Williams and three other Randstad employees) had received on her Randstad email account from Ethridge, attaching a confidential, 147-page draft RFP

## VIII. <u>BHSG's Hire of Williams, Keliher, and Ethridge Constitutes an Attempt to Unfairly Compete with Randstad and Build an MSP Group Using Randstad's Work</u>

Prior to BHSG's hire of Keliher, Williams, and, on information and belief, Ethridge, BHSG did not have an mid-market MSP. *Id.* at ¶ 115. In fact, BHSG issued a press release on February 27, 2017, announcing Beacon Hill Solutions as its eighth division, to be run by Keliher and Williams.[16] *Id.* On information and belief, other than the page on BHSG's website, this was the first public announcement of the formation of this new group. *Id.*

On information and belief, BHSG hired Williams, Keliher, and (on information and belief) Ethridge to form a mid-market MSP using Randstad's confidential information and trade secrets, in order to compete unfairly with Randstad and enter the market without the required investment of time or capital. *Id.* at ¶ 117. Indeed, with Williams', Keliher's, and Ethridge's intimate knowledge of RCS and its mid-market MSP offering, BHSG has a blueprint to create a competing offering, without putting in the time, money, and effort that would otherwise be required to establish its mid-market MSP. *Id.* at ¶ 118. Given BHSG's obvious push to enter the mid-market MSP space, as evidenced by its hiring of Williams, Keliher, and (on information and belief) Ethridge, and its website pages that parrot Randstad's own language, it is reasonable to conclude that Williams, Keliher, and Ethridge have utilized and/or inevitably will utilize Randstad's trade secrets and confidential information to build this new practice for BHSG and to compete unfairly with Randstad (particularly given that each of these individuals improperly

---

response to a prospective customer, which had been prepared by Ethridge. *Id*. at ¶ 112. This RFP response contained detailed information regarding, among other things, the new Centralized Delivery model, Randstad sales and pricing information, and highly confidential information relating to RCS's unique business model. *Id*. The information contained in this RFP response was subject to a mutual non-disclosure agreement between Randstad and the prospective customer. *Id*. This information would be extremely valuable to a competitor, particularly to a new market entrant such as BHSG, which would otherwise have to spend a substantial amount of time and money accumulating the information contained in the RFP response, not to mention that it contained highly confidential Randstad information that could certainly be used to compete unfairly with Randstad. *Id*. at ¶ 113.

[16] http://www.prnewswire.com/news-releases/beacon-hill-launches-new-division--bh-solutions-300413936.html

forwarded or retained confidential Randstad information). *Id.* at ¶ 119. Indeed, that is likely why they were hired. *Id*. BHSG's CEO's directive to Keliher and Ethridge not to disclose BHSG as their new employer evidence an attempt to conceal facts from Randstad and to lull Randstad into inaction. *Id.* at ¶ 120. These actions evidence BHSG's improper motives in hiring Williams, Keliher, and on information and belief, Ethridge, and in inducing Williams to breach his obligations to Randstad. *Id.* This is classic unfair competition.

## ARGUMENT

In order to obtain a temporary restraining order or preliminary injunction, a plaintiff must establish four elements: (1) likelihood of success on the merits, (2) a risk of irreparable harm, (3) equitable considerations favor an injunction and (4) an injunction would be in the public interest. *See Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008); *Real Truth About Obama, Inc. v. Federal Election Comn.*, 575 F.3d 342, 346 (4th Cir. 2009). Here, the requirements for injunctive relief are satisfied, and Randstad should be granted an injunction.

### I. Without Injunctive Relief, Randstad Will Suffer Irreparable Harm.

Randstad's interests will be irreparably harmed by the Defendants' conduct if they are not enjoined from continuing their unlawful actions. "Irreparable injury is suffered when monetary damages are difficult to ascertain or are inadequate." *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551-552 (4th Cir. 1994). Indeed, "it is nearly impossible to quantify the amount of damage caused when former employees work for direct competitors." *PADCO Advisors, Inc. v. Omdahl*, 179 F. Supp.2d 600, 612 (D. Md. 2002). Injunctive relief is appropriate under these circumstances.

Randstad quite obviously has a protectable interest in preventing Williams from using its confidential information to help a competitor create a competing mid-market MSP, as Maryland has recognized that irreparable harm will result from the disclosure of trade secrets. *See Nat'l*

*Instrument v. Braithwaite*, 2006 WL 2405831, at *5 (Md. Cir. Ct. June 5, 2006) ("Through his position as Director of Manufacturing and member of the Executive Board, [defendant] was exposed to proprietary and confidential information. . . . Exposure of this information to a competitor would almost inevitably injure [plaintiff] . . . Therefore, a reasonable restraint on [defendant] is necessary for the protection of [plaintiff's] business and goodwill"); *see also Space Aero Products Co. v. R.E. Darling Co*., 238 Md. 93, 123-24 (1965) (injunction is a proper equitable remedy to protect the interest of the owner of a trade secret against disclosure).

Likewise, "when the failure to grant preliminary relief creates even the **possibility** of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied." *Corporate Healthcare Financing, Inc. v. BCI Holdings Co.*, 2006 WL 1997126, *4 (D. Md. July 13, 2006) (emphasis added) (citing *Multi-Channel*). Such losses may be impossible to quantify and to remedy. Maryland courts have defined goodwill as an "intangible property asset . . . the advantage or benefit, which is acquired in consequence of the general public patronage and encouragement, which it receives from constant or habitual customers, on account of its local position, or common celebrity, or reputation for skill or affluence, or punctuality . . . ." *Prahinski v. Prahinski*, 75 Md. App. 113, 126 (1988).

In addition to the imminent threat to Randstad's confidential information and goodwill, Randstad also faces the substantial likelihood that its full damages against Defendants will not be ascertainable. As the Fourth Circuit explained in *Multi-Channel*, 22 F.3d at 551-552, where a plaintiff will find it "difficult" to reconstruct the monetary losses it is suffering at the hands of a defendant, the harm, even though monetary, is considered irreparable. Additionally, the likelihood that proof will be lost or that later accounting will not be able to clearly show monetary damages also weighs in favor of granting the injunction. *Id.* (where nature of business

resulted in inability to calculate monetary damages, injunction appropriate); *see also Blackwelder Furn. Co. v. Seilig Mfg. Co., Inc.*, 550 F.2d 189, 197 (4th Cir. 1977) ("Irreparability of harm includes the impossibility of ascertaining with any accuracy the extent of the loss").

Here, the factual allegations from the Complaint establish that Randstad will suffer irreparable harm if a temporary restraining order and preliminary injunction are not issued. If Williams is not enjoined from performing the same or substantially similar work for BHSG as he performed for Randstad in the restricted Work Territory, and if BHSG is not enjoined from unfairly competing with Randstad (both by using its confidential information and by benefitting from its tortious interference with the Agreement), it is likely that Randstad will be irreparably harmed. As such, Randstad simply cannot "unring that bell" and Williams should be immediately enjoined from working at BHSG in a competing position, soliciting Randstad employees, customers, and Talent, and disclosing and using Randstad's confidential and proprietary information. It would be unreasonable to require Randstad to sit idly by and wait while Defendants use its confidential and proprietary information to prop up BHSG's new mid-market MSP to directly compete with Randstad.

To be clear, injunctive relief is the only remedy proper in this case. Randstad has no adequate remedy at law that will safeguard the integrity of its confidential information and goodwill or make it whole if Defendants are permitted to proceed with their plans. The damage to Randstad may be incalculable, and devastating, unless Defendants are restrained.

## II. <u>The Balance of Equities Tips in Randstad's Favor</u>

The facts set forth in the Complaint demonstrate that the balance of equities tips decidedly in Randstad's favor. Neither defendant will suffer harm sufficient to deny Randstad's requested relief.

Although Williams may suffer some harm -- to the extent he is prevented from receiving

a windfall in exchange for Randstad's know-how and confidential information -- he is highly skilled and can, if he desires, earn a living in the staffing field within the limitations of his non-competition covenants even if the Agreement is enforced. *See Intelus Corp. v. Barton*, 7 F. Supp. 2d 635, 639-40 (D. Md. 1998) (enforcing restrictive covenant and enjoining former employee from competing directly with former employer, citing the fact "there were similar companies not in this specific market 'niche'" that he could work for). Whether he may earn somewhat less in compensation if the Agreement is enforced is completely irrelevant; this hardship has been created by his own willful acts in violating the Agreement and misappropriating Randstad's proprietary and confidential information. *See NaturaLawn of Am., Inc. v. W. Grp., LLC*, 484 F. Supp. 2d 392, 402-04 (D. Md. 2007) ("While a court fashioning an equitable remedy should not impose hardship on a defendant which exceeds that required to protect a plaintiff's legitimate contractual interests, the often painful harm which follows a defendant who willfully breaches a contractual undertaking is not a basis for denying a plaintiff the relief to which it is legally entitled"). Courts have found that the irreparable harm to an employer outweighs the harm to a former employee even where the employee was forced to endure much more substantial hardship. *See Intelus*, 7 F. Supp.2d at 639 (potential harm to employer's customer relationships outweighed the former employee's hardship where he was forced to leave his new job and seek other employment).

Even if bound by the requested temporary restraining order and preliminary injunction, Williams will be able to continue to work for BHSG in any of its other seven business divisions, and will be able to sell any of its non-MSP services to customers he did not have material contact with in his last two years at Randstad, in any sales territory, including the territory in which he lives and which he previously serviced for Randstad. Thus, Williams will be able to earn a

living for his current employer even if he is enjoined.

Similarly, no undue hardship harm will befall BHSG if it is restrained and enjoined. "[T]here is a substantial difference between [BHSG's] loss of potential customers and [Randstad's] loss of current customers." *Corporate Healthcare*, 2006 WL 1997126 at *6 (balance of harms "tips decidedly" in plaintiff's favor where defendant would not lose any current customers, but just "the opportunity to compete for new business"). Any potential harm to BHSG caused by not allowing them to pursue Randstad's clients pales in comparison to the harm to Randstad of losing those customers.

BHSG will be able to do anything it could have done prior to hiring Williams, including soliciting Randstad customers to sell competing products, provided it does not use Williams or his knowledge of Randstad's confidential information. BHSG will be no worse off than it would have been without improper access to Randstad's trade secrets or its unlawful interference with the Agreement. Randstad is deserving of this protection against improper back door efforts by BHSG, given BHSG'S intentional and improper inducement of Williams to violate his Agreement and solicit Randstad's customers.

For all the aforementioned reasons, the balance of hardships in this case weigh heavily in favor of Randstad.

## III. <u>Randstad Has Demonstrated a Likelihood of Success On The Merits</u>

As set forth below, Randstad has a strong likelihood of success on the merits on each of its claims against the Defendants, supporting its request for injunctive relief.

### A. <u>Breach of Contract</u>

It has always been the policy of the State of Maryland to enforce reasonable restrictive

covenants in connection with an employment agreement.[17] *See, e.g.*, *Deuerling v. City Baking Co.*, 155 Md. 280 (1928); *Tolman Laundry v. Walker*, 171 Md. 7 (1936). More specifically, a restrictive covenant in an employment contract, by which an employee "undertakes not to engage in a competing business or vocation with that of his employer on leaving the employment, will be sustained 'if the restraint is confined within limits which are no wider as to area and duration that are reasonable necessary for the protection of the business of the employer and do not impose undue hardship on the employee or disregard the interests of the public.'" *MacIntosh v. Brunswick Corp.*, 241 Md. 24, 31 (1965) (quoting *Silver v. Goldberger*, 231 Md. 1, 6 (1963)). *See also Corporate Healthcare*, 2006 WL 1997126 at *24.

### 1. The Agreement is Enforceable

Maryland courts enforce covenants not to compete where they satisfy four requirements: (1) the employer must have a legally protected interest, (2) the restrictive covenant must be no wider in scope and duration than is reasonably necessary to protect the employer's interest, (3) the covenant cannot impose an undue hardship on the employee, and (4) the covenant cannot violate public policy. *Deutsche Post Global Mail, Ltd. v. Conrad*, 116 F. Appx. 435, 438 (4th Cir. 2004). Each of these factors weighs in favor of enforcement in this case.

#### a. Randstad has a legally protected interest

First, Randstad has a legally protected interest supporting the Agreement. As described above, by virtue of his employment with RCS and his position on its executive leadership team, Williams was privy to and used Randstad's trade secrets and confidential information in the context of his employment. Indeed, Williams had ready access to, among other things, RCS's overall strategy, details regarding its solutions, approach to the market, operations, structure,

[17] Section 16 of the Agreement provides that it will be governed by, and construed in accordance with, the laws of the State in which Williams was employed by and performed services for Randstad as of the execution date (in this case, Maryland).

sales, financials, client retention strategy, and future plans. Accordingly, Randstad has a legitimate business interest sufficient to support the Agreement. *See Becker v. Bailey*, 268 Md. 93, 98 (1973) (non-competes enforceable against "employees who provide unique services, or to prevent the future misuse of trade secrets, routes or lists of clients, or solicitation of customers"); *Fowler v. Printers II*, 598 A.2d 794, 799 (Md. Ct. App. 1991) (same); *Mansell v. Toys R Us, Inc.*, 673 F. Supp.2d 407, 416 (D. Md. 2009) (same); *Intelus*, 7 F. Supp. 2d at 639 (good will is protectable interest); *Deutsche Post*, 116 F. Appx. at 438 (same; restrictive covenants almost always serve a legitimate employer interest when they restrict employees who "serviced, solicited, and were in constant contact with customers").

**b. The duration and scope of the Agreement are reasonable**

Additionally, the duration and scope of the restrictive covenant at issue here -- a two-year prohibition on performing the same or substantially similar activities that Williams performed for Randstad, in the geographic area in which he worked for Randstad -- is narrowly tailored and therefore reasonable and within the bounds of restrictions previously enforced by other Maryland cases. *See, e.g., PADCO Advisors, Inc. v. Omdahl*, 179 F. Supp. 2d 600, 606 (D. Md. 2002) (enforcing a two-year restriction without a geographic limitation); *Intelus*, 7 F. Supp. 2d at 641 (enforcing restriction with no geographic limitation because the restriction was still reasonable in light of plaintiff's nationwide business model); *Corporate Healthcare*, 2006 WL 1997126 at *7 (absence of geographic restriction did not render covenant unenforceable, given sophistication of the parties and the nationwide scope of each company's business).

This Court's decision in *Allegis Grp., Inc. v. Jordan*, 2014 WL 2612604 (D. Md. June 10, 2014) is directly on point and even arises out of the staffing industry. The *Allegis* defendant's agreement prohibited him from engaging in "any aspect of [plaintiff's] Business [locating, selecting, screening, and placing candidates in temporary and permanent employment positions]

in which [he] performed work during the two (2) year period preceding his/her termination of employment, in any state of the United States or province of Canada where [plaintiff] conducted business during the term of [defendant's] employment . . ." 2014 WL 2612604 at *2. Thus, the scope of the *Allegis* defendant's non-compete provisions was even broader than Williams', in that it prohibited him from working anywhere in the United States or Canada where his employer conducted business, not just where the employee himself had performed work on behalf of his employer (as Williams' Agreement provides).

Nonetheless, this Court determined that because the employer competed for business on a national and international level (like Randstad), and because the provision only prevented the defendant from competing with his former employer in those aspects of business for which he performed work in the two years preceding his termination (just as Williams' does, except that Williams' Agreement only looks back one year prior to termination), the covenant was reasonable. *Id.* at *6. In so holding, the Court noted that "[w]hen a company competes for business on a national and international level, a restrictive covenant limited to a narrow geographic area would render the restriction meaningless." *Id.* (internal punctuation and citations omitted). The Court also stressed that the provision's language limiting the non-compete to those businesses that the defendant had supported (just as Williams' Agreement does) rendered it reasonable. *Id.*

The mid-market MSP industry is a highly specialized industry for which Randstad was *the* innovator. Even considering BHSG's newly formed mid-market MSP, there are still currently only *three* companies offering this service in the world. Given the extremely limited number of competitors in the marketplace and the global reach of RCS's services, even a world-wide geographic restriction would be reasonable. *See Nat'l Instrument*, 2006 WL 2405831 at *6

(restrictive covenant spanning "North America and Mexico" not overly broad because plaintiff engaged in a specialized industry with 18 competitors throughout the U.S. and where plaintiff's product was global in scope). Certainly, a two-year restriction limited to the geographic locations that Williams worked in for Randstad is reasonable.

**c. The Agreement does not impose undue hardship on Williams, nor does it violate public policy**

Finally, as set forth *supra* Section II, Williams will suffer little -- if any -- hardship by being required to abide by his agreed-upon restrictions. Likewise, the public interest will be served by enforcing Williams' Agreement, which was entered into voluntarily and which provided Williams with tangible benefits, including, but not limited to, employment, training, and receipt of Randstad's confidential information and trade secrets, which allowed him to pursue a lucrative career with Randstad over the course of five years. *See Allegis*, 2014 WL 2612604, *7 (finding that 2 year non-compete in staffing industry covering U.S. and Canada would not create an undue hardship for employee, nor would the covenant be injurious to the public interest, as "[t]he plain and unambiguous language of the provision permits [defendant] to compete with any [business line] that he did not support while employed with [plaintiff]").

For all of the foregoing reasons, the Agreement is enforceable.

**d. Williams has Breached the Agreement**

Williams has now violated the Agreement by accepting a position with BHSG in its brand new mid-market MSP group (in fact, it is clear that Williams, along with Keliher, *created* BHSG's new mid-market MSP group using Randstad's confidential information to compete unfairly with Randstad). Based on his online BHSG bio, which claims that he is "responsible for leading and directing delivery, client service, and operations *across the country* for Beacon Hill Solutions" (emphasis added), Williams is performing the exact same work for BHSG's mid-

market MSP group in *all* of the territories where he performed work for Randstad. Such conduct blatantly violates the terms of the Agreement. Additionally, there is sufficient evidence to suggest that Williams improperly solicited (whether directly or indirectly) Ethridge (if not Keliher too), and that he misappropriated Randstad's confidential and proprietary information, both of which constitute direct violations of the Agreement.

Because the underlying Agreement is valid and credible evidence shows Williams breached the Agreement by accepting a position as the Executive Director of Beacon Hill Solutions at BHSG, soliciting Ethridge (and/or Keliher), and misappropriating Randstad's confidential information and trade secrets, Randstad has a very high likelihood of success on the merits of its breach of contract claim against Williams.

**B. Tortious Interference**

In order to establish that BHSG tortiously interfered with the Agreement, Randstad must show: (1) the existence of a contract with Williams; (2) BHSG's knowledge of that contract; (3) BHSG's intentional interference with that contract; (4) Williams' breach of the contract; and (5) resulting damages to Randstad. *See Ancora Capital & Mgmt. Group, LLC v. Corporate Mailing Servs., Inc.*, 214 F. Supp. 2d 493, 499 (D. Md. 2002). It is well-settled that "a former employer can recover from a new employer for tortiously interfering with an employee's [restrictive covenant]." *Fowler v. Printers II*, 598 A.2d 794, 804 (Md. Ct. App. 1991); *see also Barnes Group, Inc. v. C&C Prods.*, 716 F.2d 1023 (4th Cir. 1983) (finding new employer had tortiously interfered with employees' contracts where it encouraged employees to breach their restrictive covenants and use confidential information received at former employer to divert business to new employer).

A new employer need not even have knowledge of the restrictive covenant at the time of the employee's hire to be liable for tortious interference -- rather a plaintiff only must show that

upon the new employer's learning of the restrictive covenant, it "nevertheless engaged the employee to work for him in an activity that would mean violation of the [restrictive covenant]." *Fowler*, 598 A.2d at 804. Moreover, the defendant employer's "wrongful belief that a contract is invalid or unenforceable is not a defense to a tortious interference claim." *Ancora Capital*, 214 F. Supp. 2d at 499.

As set forth *supra* Section III.A.2, Randstad had a valid contract with Williams; i.e., the Agreement. Given the fact that BHSG's CEO instructed both Keliher and Ethridge (and likely Williams) not to divulge their new employer for thirty days, it is apparent that BHSG is and has been fully aware of the Agreement, which specifically restrained Williams from performing, in the prohibited Work Territory, the "same or substantially similar activities [he] performed for Randstad" during the one year prior to his resignation. Moreover, BHSG has been and intends to continue capitalizing on the information Williams learned from RCS's MSP in order to build a competing business, not organically, but by purloining RCS's innovative and unique business model and confidential information. This is made evident by the fact that Williams and Keliher appear to be the only BH Solutions employees, and the BH Solutions website bears an uncanny resemblance to Randstad's MSP marketing materials. Indeed, the evidence adduced to date demonstrate that BHSG intentionally, and improperly, interfered with the Agreement in order to obtain a blueprint for BH Solutions without putting in the time, money, and effort that would otherwise be required to establish its mid-market MSP.

As noted *supra* Section III.A.2, Williams has breached the Agreement, and per Section I *supra*, Randstad has suffered and will continue to suffer irreparable harm due to BHSG's interference with the Agreement. BHSG is thus liable for intentional interference with contract for such activities under Maryland law. *See Fowler*, 598 A.2d at 804-805 ("A company which

knowingly participates in, encourages, and accepts the benefits of, acts of unfair competition committed by a person against a former employer is liable for those acts”).

**C. <u>Violations of the DTSA and MUTSA</u>**

Under the Defend Trade Secrets Act (“DTSA”) and the Maryland Uniform Trade Secret Act (“MUTSA”), the term “trade secret” includes all forms and types of financial, business or economic information if (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, the public. *See* 18 U.S.C. §§ 1836, 1839; Md. Code Ann. §§ 11-1201 *et seq.*

The information contained in the Randstad Centralized Delivery presentation that Williams improperly forwarded to his personal email address (likely after he had been approached, if not offered a job, by BHSG) -- and which presumably BHSG has obtained from Williams -- includes the design and structure of Randstad’s innovative and proprietary Centralized Delivery model, which is only just now being rolled out internally within Randstad, and how it would support Williams’ specific accounts and programs, including various scenarios regarding Williams’ accounts, such how the new centralized delivery model would be implemented in those accounts. As previously noted, this presentation is internal only, highly confidential and proprietary, and should not have been forwarded to Williams’ personal email, as the information contained therein would be extremely valuable to a competitor, in particular a new market entrant such as BHSG. Likewise, more generally, the information that Williams learned during his employment with RCS is a protectable trade secret under the DTSA and MUTSA. *See, e.g., Optic Graphics, Inc. v. Agee*, 87 Md. App. 770, 787 (Md. Ct. Spec. App. 1991) (marketing strategy and pricing information are trade secrets).

Moreover, Randstad takes reasonable and appropriate measures to protect the

confidentiality of the above-described trade secrets by, among other things:

- Requiring employees to enter confidential, personal usernames and passwords in order to gain access to Randstad's server and e-mail accounts;
- Requiring employees to enter a second, unique username and password in order to gain access to the confidential, secure CRM database;
- Requiring employees to use yet another password to access other confidential databases, such as its contract negotiation tool;
- Limiting access to physical space at its various offices through, among other things, company-issued badges;
- Requiring key employees, such as Williams, to execute employment agreements containing restrictive covenants to protect its confidential information; and
- Promulgating comprehensive policies regarding employees' access to and use of confidential information, including the policies contained in the Employee Handbook (which includes the Code of Business Conduct, policies surrounding the protection of confidential information and return of company property, etc.) and the Electronic Communications Policy (which likewise lays out prohibited conduct regarding the dissemination of confidential information, and includes guidelines for the protection of passwords).

Accordingly, this information constitutes trade secrets within the meaning of the DTSA and MUTSA because it derives independent economic value from not being generally known to, or reasonably ascertainable by proper means by, the public; and it is the subject of reasonable efforts to maintain its secrecy. It thus cannot be denied that the information that Williams obtained while employed by Randstad (including but not limited to the Randstad Centralized Delivery presentation that he misappropriated), and which is related to Randstad services used in interstate commerce, is protectable under the DTSA and MUTSA.

Williams (and subsequently BHSG) knowingly acquired these trade secrets by improper means and without authorization and therefore misappropriated Randstad's trade secrets under the DTSA and MUTSA. In particular, Williams stole from Randstad and retained after his employment ended Randstad's trade secret information, in violation of his obligations under

Randstad's Employee Handbook, Electronic Communications Policy, and the Agreement itself.[18] As set forth herein, it is obvious that the Defendants are unlawfully using Randstad's trade secrets to create BHSG's own competing mid-market MSP group, thereby irreparably harming Randstad's legitimate business interests.

For the foregoing reasons, Randstad is likely to succeed on the merits of its claim under the DTSA and MUTSA.

### D. Unfair Competition

Defendants' conduct also constitutes unfair competition under Maryland law, which prohibits a broad range of inappropriate commercial conduct. *See, e.g., Delmarva Sash & Door Co. of Maryland, Inc. v. Andersen Windows, Inc.*, 218 F.Supp. 2d 729, 733 (D. Md. 2002) ("[u]nder Maryland law, the tort of common law unfair competition extends to all cases of unfair competition in the field of business" and is "subject, only, to the general principle that all dealings must be done on the basis of common honesty and fairness, without taint of fraud or deception) (emphasis added, internal citations omitted); *Trimed, Inc. v. Sherwood Medical Co.*, 977 F.2d 885, 891 (4th Cir. 1992) (same); *Baltimore Bedding Corp. v. Moses*, 182 Md. 229, 236-37 (1943) ( "no one . . . is justified in damaging or jeopardizing another's business by . . . unfair methods of any sort"). In Maryland, one simply "may not reap where another has sown nor gather where another has strewn." *Lowry's Reports, Inc. v. Legg Mason, Inc.*, 271 F.Supp. 2d 737, 754-5 (D. Md. 2003) ("the controlling legal principles [of unfair competition] are simply the principles of old-fashioned honesty") That is exactly what BHSG is doing here -- creating a

[18] Importantly, the full scope of the information that Williams stole and BHSG has received from him is unknown. Williams's course of conduct evidences a disregard for his contractual and other legal obligations and an intent to steal confidential information, and suggests that Defendants may remain in possession of other information that they have not yet made known to Randstad. As such, any representations that Defendants offer on this subject cannot be taken at face value and must be subjected to forensic scrutiny, in order to determine the extent of their misconduct and the full range and nature of the information that they misappropriated.

competing MSP offering using Randstad's own work product.

## IV. <u>The Public Interest Weighs In Favor Of Enjoining Defendants</u>

The public interest is also served by requiring Williams to abide by the terms of his agreement with Randstad, and by requiring BHSG to compete fairly. Granting injunctive relief is in the public interest where it can be demonstrated that the Defendants "purposely entered into a course of action, based on thin legal arguments, which sought to avoid contractual obligations. It is in the public interest to repudiate this type of activity and enforce valid contracts." *NaturaLawn*, 484 F. Supp. 2d at 402-404. *See Intelus,* 7 F. Supp. 2d at 642 ("[T]he public has an interest in the enforcement of reasonable restrictive covenants"); *Ruhl v. F. A. Bartlett Tree Expert Co.*, 245 Md. 118, 127 (1967) (finding enforcement of a restrictive covenant in the public interest in a highly competitive industry). "[T]he burden placed on society as a whole is minimal." *Nat'l Instrument*, 2006 WL 2405831 at *7. "The Covenant only prohibits [Williams] from working for a competitor of [Randstad] in the [mid-market MSP] industry for a period of two (2) years. He is not prohibited from employing his . . . talents in a similar or related industry. Thus, even for those two (2) years, the public will not endure any loss from his services." *Id*. Moreover, the parties to a contract are expected to keep their promises. Williams simply decided he could earn more money by violating the Agreement, and he did so knowingly and willfully.

Similarly, BHSG believed that it could build a competing MSP using Randstad's confidential information and work product, and by inducing Williams to breach his Agreement, despite the fact that such conduct is unlawful. Additionally, both Defendants have violated the DTSA and MUTSA by misappropriating or threatening to misappropriate Randstad's trade secrets. Equity requires such actions be enjoined. Here, the public interest strongly favors granting the injunction as it will result in the enforcement of a valid contract.

## CONCLUSION

The credible evidence adduced by Randstad supports the issuance of injunctive relief. Because "immediate, substantial, and irreparable harm will result to [Randstad] before a full adversary hearing can be held on the propriety of a preliminary or final injunction" a temporary restraining order and preliminary injunction are proper.

Respectfully submitted,

RANDSTAD GENERAL PARTNER (US), LLC,
By its Attorneys,

*/s/ Edward V. Arnold*

Edward V. Arnold (VSB # 80087)
SEYFARTH SHAW LLP
975 F Street, NW
Washington, D.C. 20004-1454
Telephone: (202) 463-2400
Facsimile: (202) 828-5393
earnold@seyfarth.com

Date: March 10, 2017

Erik W. Weibust (to be admitted *pro hac vice*)
Dawn Mertineit (to be admitted *pro hac vice*)
SEYFARTH SHAW LLP
Two Seaport Lane, Suite 300
Boston, Massachusetts 02210
Telephone: 617-946-4800
Facsimile: 617-946-4801
eweibust@seyfarth.com
dmertineit@seyfarth.com

## REQUEST FOR HEARING

Plaintiff Randstad General Partner (US), LLC, requests hearings on its Motions for a Temporary Restraining Order and Preliminary Injunction at the earliest possible time.

*/s/ Edward V. Arnold*
Edward V. Arnold